Kimberly A. MOLLOY, et
al., Respondents,

v.

Diane M. MEIER, M.D.,
et al., Appellants,

Reno E. Backus, M.D.,
et al., Appellants,

North Memorial Health Care d/b/a
North Memorial Medical
Center, Defendant.

Nos. C9–02–1821, C2–02–1837.

Supreme Court of Minnesota.

May 20, 2004.

David D. Alsop, Laura J. Myslis, Gislason & Hunter, LLP, Minnetonka, MN, for Appellants, Reno E. Backus, M.D., Kathryn H. Green, M.D., and Minneapolis Clinic of Neurology, Ltd.

Katherine A. McBride, Barbara A. Zurek, William M. Hart, Meagher & Geer, PLLP, Minneapolis, MN, for Appellants, Diane Meier, M.D. and Partners in Pediatrics, Ltd.

Terry L. Wade, Wendy J. Zeller, Anne E. Workman, Robins, Kaplan, Miller & Ciresi, LLP, Minneapolis, MN, for Respondent, Kimberly A. Molloy.

Richard J. Thomas, Chad J. Hintz, Burke & Thomas, PLLP, New Brighton, MN, for Amicus, Physician Insurers Association of America.

Rebecca Egge Moss, Charles E. Lundberg, Tiffany M. Quick, Bassford, Remele, PA, Minneapolis, MN, for Amici, Minnesota Medical Association, Minnesota Hospital Association, Minnesota Medical Group Management Association, and American Medical Association.

## OPINION

MEYER, Justice.

Kimberly Molloy (Molloy) and her husband, Glenn Molloy, brought a medical malpractice action against appellants Dr. Diane Meier, Dr. Reno Backus, and Dr. Kathryn Green, claiming they were negligent in failing to diagnose a genetic disorder in Molloy's daughter and their negligence caused Molloy to conceive another child with the same genetic disorder. The district court denied the appellants' motion for summary judgment and concluded that a physician who performs genetic tests on a child owes a .duty to the biological parents of that child; that the action did not accrue until the time of conception and, therefore, was not time-barred; and that the action was not barred by Minn.Stat. § 145.424 (2002), which prohibits causes of action for wrongful birth and wrongful life. The court of appeals answered three certified questions and upheld the denial of summary judgment.[1] We granted review and now affirm the court of appeals.

This case arises out of the medical treatment of S.F., the daughter of Kimberly Molloy and her ex-husband, Robert Flomer. As a young girl, S.F. was treated by appellant Dr. Diane M. Meier at Partners

1. The court of appeals also held that the appellants did not owe a duty to "convey medical information regarding S.F. to Glenn Molloy." *Molloy v. Meier,* 660 N.W.2d 444, 453 (Minn.App.2003). Glenn Molloy did not petition this court for cross-review of the court of appeals' decision on this point.

in Pediatrics (formerly Oakdale Pediatrics). When S.F. was three years old, Dr. Meier noted during a check-up that S.F. was developmentally delayed. Dr. Meier ordered a number of tests, but the results did not reveal the source of S.F.'s difficulties. On May 18, 1992, Dr. Meier met with Molloy, Robert Flomer, and S.F. to discuss the possible causes for S.F.'s developmental delays, including the possibility of a genetic cause. Molloy told Dr. Meier about Molloy's mentally retarded half-brother and asked Dr. Meier to conduct genetic tests on S.F. to determine whether S.F. had inherited any abnormalities from Molloy.

In her notes from the May 18 visit, Dr. Meier wrote "? chromosomes + fragile X," which meant she intended to order chromosomal testing and testing for Fragile X syndrome.[2] In May of 1992, a Fragile X chromosomal test capable of diagnosing the disorder with 70 to 80 percent accuracy was in widespread use. A parent who is a carrier of Fragile X has up to a 50 percent chance of giving birth to a child with the condition. Although physicians can treat the symptoms of Fragile X, the condition itself is incurable. Dr. Meier conceded that "it was appropriate to test [S.F.] for [F]ragile X in keeping with accepted standards of pediatric practice on May 18, 1992." According to Molloy, Dr. Meier told her that if S.F. tested positive for a genetic disorder, Molloy should be tested herself.

On June 17, 1992, the chromosome testing ordered by Dr. Meier was performed at North Memorial Medical Center. On July 18, 1992, North Memorial's laboratory reported normal chromosome testing for S.F. Dr. Meier received the test results, telephoned the Flomers and informed them that the test results were negative; i.e., normal. However, Dr. Meier failed to mention that Fragile X testing had not been performed.[3] The Flomers then informed Molloy that the test results were "normal." Based on the fact that Dr. Meier had mentioned Fragile X in her discussion of chromosomal testing, Molloy assumed that the negative test results included a negative result for Fragile X.

Meanwhile, on June 23, 1992, S.F. was referred by Dr. Meier to the Minneapolis Clinic of Neurology where she was seen by Dr. Reno Backus. Dr. Backus testified in his deposition that his role was to evaluate S.F. and report back to Dr. Meier, the referring physician. Dr. Backus met with S.F., Molloy, and the Flomers, and diagnosed S.F. with a pervasive developmental delay of unknown origin. Molloy inquired about her chances of conceiving another child with S.F.'s defect. According to Molloy, Dr. Backus responded that S.F.'s problems were not genetic in origin and the risk that Molloy might give birth to another child like S.F. was extremely remote, especially with a father other than Robert Flomer. Dr. Backus was aware that chromosomal testing had been done but he made his assessment before the test results were known.

Several years later S.F. was referred to Dr. Kathryn Green, who was an employee of the Minneapolis Clinic of Neurology.

2. According to the expert witnesses, Fragile X syndrome, one of the leading causes of mental retardation, is often hereditary and causes developmental delays and symptoms ranging from mild learning disabilities to severe mental retardation. Fragile X is a mutation in the Fragile X Mental Retardation 1 gene in the DNA that makes up the X chromosome.

3. Dr. Meier testified in a deposition that she intended to order both chromosome and Fragile X testing and could not determine "where the system breakdown occurred" that resulted in no testing for Fragile X.

When Dr. Green saw S.F. on April 30, 1996, she had the office chart of Minneapolis Clinic, including Dr. Backus's 1992 report. There were no Fragile X testing results in the chart because the testing had never been done. Dr. Green knew of Molloy's mentally retarded half-brother who had exhibited problems similar to S.F.'s. Despite having this information, Dr. Green did not order or recommend Fragile X testing. Dr. Green testified that she recognized the importance of Fragile X testing in general, but she assumed such tests had already been performed on S.F. and had come back negative, as S.F. had already seen three physicians.

In the meantime, Molloy remarried and gave birth to M.M. on June 30, 1998. M.M. showed signs of the same developmental difficulties as S.F., so his pediatrician, Dr. David Tilstra, ordered Fragile X testing for him. The Fragile X test results were positive; i.e., M.M. carried the Fragile X genetic disorder. When Dr. Tilstra received the positive results, he counseled Kimberly and Glenn Molloy about Fragile X syndrome and recommended that they and other potentially affected family members receive testing. Based on Dr. Tilstra's recommendation, S.F. and Kimberly Molloy were tested for Fragile X, and it was discovered that they both carried the genetic disorder.

Molloy commenced this lawsuit on August 23, 2001, alleging that Drs. Meier, Backus, and Green and their employers were negligent in the care and treatment rendered to S.F., Kimberly Molloy, and Glenn Molloy by failing to order Fragile X testing on S.F., failing to properly read those lab tests that were performed, mistakenly reporting that S.F. had been tested for Fragile X, and failing to provide counseling to Kimberly and Glenn Molloy regarding the risk of passing an inheritable genetic abnormality to future children.

Molloy claimed she would not have conceived M.M. if Drs. Meier, Backus, and Green had correctly diagnosed S.F. with Fragile X and informed Molloy of the diagnosis.

Drs. Meier, Backus, and Green and their employers moved for summary judgment, arguing that they did not owe a duty to the family of a patient and that, in any event, Molloy's action was barred by the four-year statute of limitations for medical malpractice claims. In opposition, Molloy presented expert testimony of a pediatrician and a pediatric neurologist who described the prevailing standard of care in the medical community with respect to testing and counseling for genetic disorders. The experts indicated that a patient who exhibits the symptoms of this disorder with a family history of mental retardation should be tested for Fragile X. Further, a physician who identifies the possibility of Fragile X has a responsibility to follow up to confirm that the tests are performed. Finally, the physician of a child with Fragile X has an obligation to provide genetic counseling to the child's family.

In deposition testimony, the appellants each somewhat confirmed the standard of care described by Molloy's expert witnesses. Dr. Meier admitted that her practice is to communicate the results of Fragile X testing to the child's "primary" parents and inform them that the condition may be inherited. Dr. Backus acknowledged that Fragile X testing would have been appropriate for a child such as S.F. and that diagnoses of diseases such as Fragile X have implications for the entire family. Dr. Green conceded that a physician should share the genetic implications of positive genetic test results with the parents of a child diagnosed with an inheritable disorder.

The district court denied summary judgment, concluding that the defendants owed

a duty to the biological parents of the child, the cause of action was not barred by the four-year statute of limitations, and a claim for wrongful conception was permitted under Minn.Stat. § 145.424. Subsequently, the district court certified the following questions to the court of appeals as "important and doubtful" under Minn. R. Civ.App. P. 103.03(i).[4]

(a) Does a physician who allegedly fails to test for and diagnose a genetic disorder in an existing child leading to the birth of a subsequent child with that disorder owe a legal duty to the child's parents?

(b) When does the statute of limitations begin to run pursuant to Minn.Stat. § 541.076 (2002) in a parents' medical negligence claim alleging failure to test for and diagnose a genetic disorder in an existing child leading to the birth of a subsequent child with that disorder?

(c) Does Minn.Stat. § 145.424 prohibit parents from bringing an action alleging that they would not have conceived the subsequent child described in question (b)?

The court of appeals answered the first certified question in the affirmative: the appellants owed a legal duty to Molloy because appellants "should have foreseen that negligently rendering care to S.F. or erroneously reporting genetic test results to S.F.'s biological parents could result in the birth of another child with fragile X." *Molloy*, 660 N.W.2d at 452. The court of appeals answered the second certified question by concluding that the statute of limitations began to run at the time of M.M.'s conception, the point at which Molloy could establish damages and a viable

cause of action in tort. *Id.* at 455. In answering the third certified question, the court concluded that Molloy's action was not barred by Minn.Stat. § 145.424 because she did not claim that, but for the negligence of the appellants, M.M. would have been aborted.

## I.

▮▮▮ We begin by addressing the first certified question, whether the appellants owed a duty to Molloy regarding the genetic testing and diagnosis of S.F. for Fragile X syndrome. When we review certified questions arising from the denial of summary judgment, we must decide "whether there are any genuine issues of material fact and whether the lower courts erred in their application of the law." *Employers Mut. Cas. Co. v. A.C.C.T., Inc.*, 580 N.W.2d 490, 493 (Minn.1998) (quoting *Art Goebel, Inc. v. North Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn.1997)). The existence of a duty in a negligence case is a question of law. *Funchess v. Cecil Newman Corp.*, 632 N.W.2d 666, 672 (Minn.2001). We consider the evidence in the light most favorable to the nonmoving party. *Gradjelick v. Hance*, 646 N.W.2d 225, 231 (Minn.2002).

Molloy advances two legal theories. She first argues that a physician-patient relationship existed between her and the appellants that gave rise to a legal duty to warn her about the risks of becoming pregnant as a carrier of Fragile X. Additionally, citing *Skillings v. Allen*, 143 Minn. 323, 173 N.W. 663 (1919), Molloy urges this court to hold that even if a physician-patient relationship cannot be established, a physician's duty to warn oth-

---

4. A fourth question, whether "[i]n the type of action described [in (a) above], are the parents' damages, including the cost of care for the subsequent disabled child, recoverable only through the age of 18, the child's lifetime, or the parents' lifetime," was voluntarily withdrawn by the appellants following a jurisdictional order from the court of appeals.

ers of a patient's genetic disorder arises from the foreseeability of injury.

The appellants argue that their duty is owed only to S.F., the person with whom they had a physician-patient relationship. The appellants claim that they met with S.F. solely for S.F.'s own benefit and not for the benefit of her family. If any duty extended beyond the minor patient, the appellants argue that it should reach only those parties who have a contractual relationship with the physician, in this case the Flomers, S.F.'s custodial parents.

■ The question of whether a physician owes a duty to inform a child's family about the genetic implications of a child's genetic disorder is one of first impression in Minnesota. A medical malpractice action is based on principles of tort liability for negligence; the existence of a duty running to the plaintiff is a prerequisite to a finding of negligence. *See Plutshack v. Univ. of Minn. Hosps.*, 316 N.W.2d 1, 8 (Minn.1982).

We begin our analysis by observing that a duty to a third party who is not a patient of the physician has been recognized in only a few Minnesota cases. *See Lundgren v. Fultz*, 354 N.W.2d 25, 28–29 (Minn. 1984) (psychiatrist owed duty to third party where patient threatens foreseeable harm to that party and psychiatrist has the ability to control the risk of harm); *Cairl v. State*, 323 N.W.2d 20, 25 n. 7, 26 (Minn.1982) (treatment facility may owe duty to warn identifiable third parties of violent propensities of a mentally disabled youth whom it released if that youth poses a specific threat to those parties). We also recognized a physician's duty to third par-

ties in *Skillings v. Allen*, 143 Minn. 323, 325–26, 173 N.W. 663, 664 (1919). In that case, a minor child was hospitalized with scarlet fever. *Id.* at 324, 173 N.W. at 663. When the parents asked the child's physician about the nature of the disease and the danger of infection, the physician negligently informed them that they could safely visit their daughter in the hospital and take her home, even though the disease was in its most contagious stage. *Id.* We held that the doctor owed a duty to the parents, reasoning that "one is responsible for the direct consequences of his negligent acts whenever he is placed in such a position with regard to another that it is obvious that if he does not use due care in his own conduct he will cause injury to that person." *Id.* at 325, 173 N.W. at 663–64.[5] We declined to label the duty contractual or noncontractual, noting that under either construct, liability extends to the parents because the physician had an obligation to use due care in a situation where it was likely known that the parents would rely on the advice. *See id.* at 326, 173 N.W. at 664.

Similarly, we noted in an attorney malpractice case, *Togstad v. Vesely, Otto, Miller & Keefe*, that an attorney-client relationship existed "under circumstances which made it reasonably foreseeable to [the defendant] that [the plaintiff] would be injured if the advice were negligently given." 291 N.W.2d 686, 693 (Minn.1980). Our decision in *Togstad* derived from the professional relationship. The plaintiff in that case consulted with the attorney defendant to discuss the medical treatment of her husband, whom she believed suffered permanent brain damage as a result

---

**5.** The appellants claim that recent court of appeals decisions limit the application of *Skillings*. They rely on *McElwain v. Van Beek*, in which the court held that a physician did not owe a duty to the sister of an emergency room patient who fainted from watch-

ing the physician perform a procedure on her brother. 447 N.W.2d 442, 446 (Minn.App. 1989). Although the court based its holding on the lack of a doctor-patient relationship, it may have reached the same result under a foreseeability analysis.

of a hospital's negligence. *Id.* at 689–90. After taking notes and asking questions of the plaintiff, the defendant told her that she did not have a case for medical malpractice. *Id.* at 690. In reliance on these statements, the plaintiff did not pursue her case further until the statute of limitations for medical malpractice had run. *See id.* The plaintiff obtained expert testimony that a competent attorney would, at a minimum, obtain medical records and consult with an expert in the field before informing a client that she did not have a case. *Id.* at 691–92. We held that there was sufficient evidence to support an attorney-client relationship because it was reasonably foreseeable that negligent advice would injure the plaintiff. *Id.* at 693. We declined to adopt either tort or contract theory in resolving the case because under either legal theory the evidence established that the plaintiff "sought and received legal advice * * * under circumstances which made it reasonably foreseeable to [the attorney] that [the plaintiff] would be injured if the advice were negligently given." *Id.*

Only a few other jurisdictions have addressed the question of whether a physician owes a legal duty to the family of a patient who received negligent care in the field of genetics. In a case most analogous to the instant one, the New Jersey Supreme Court held that a physician owes a duty to members of the patient's immediate family who might be injured by the physician's breach of duty to the patient. *Schroeder v. Perkel,* 87 N.J. 53, 432 A.2d 834, 839 (1981). The court held that liability could extend to the patient's family where a doctor's failure to diagnose a first-born child with cystic fibrosis[6] led to the birth of a second child with that disorder

and it was foreseeable that the parents would rely on the diagnosis. *Id.* at 839–40; *cf. Lininger v. Eisenbaum,* 764 P.2d 1202, 1205 (Colo.1988) (holding that a physician's failure to diagnose the hereditary nature of a child's blindness that led his parents to conceive a second blind child stated a cause of action).

The Supreme Court of Florida has also held that a duty exists where "the prevailing standard of care creates a duty that is obviously for the benefit of certain identified third parties and the physician knows of the existence of those third parties." *Pate v. Threlkel,* 661 So.2d 278, 282 (Fla. 1995). In *Pate,* the defendant physician diagnosed the plaintiff's mother with medullary thyroid carcinoma, a genetically inheritable disease. *Id.* at 279. When the plaintiff learned that she also carried the disease, she sued, alleging that the defendant should have known of the inheritable nature of the disease and owed a duty to inform her mother that the plaintiff may have carried it as well. *Id.* The plaintiff presented expert testimony that the prevailing standard of care required physicians to inform patients of the genetically transferable nature of their conditions. *Id.* at 281. The Florida Supreme Court noted that the standard of care was developed for the benefit of third parties and therefore held that a physician owes a duty to those third parties of whom the physician has knowledge. *Id.* at 282.

Other courts have drawn upon the prevailing standard of care to define the duties physicians owe in the context of genetic counseling. For example, the California Court of Appeals found no duty to parents to disclose the possibility of having a child with Tay–Sachs disease when the physicians did not have any reason to sus-

**6.** Cystic fibrosis is a genetically-transmitted disease that is carried by some parents as a recessive gene, which must be borne by both

parents in order for the disease to develop in the child. *Schroeder,* 432 A.2d at 836.

pect that the parents were in a high-risk group for the disease. *Munro v. Regents of Univ. of Cal.*, 215 Cal.App.3d 977, 263 Cal.Rptr. 878, 882 (1989). That court recognized that it was impossible to test all patients and relied on expert testimony that the prevailing standard of care required testing only when parents had specific ethnic backgrounds. *Id.* Similarly, the New Jersey Court of Appeals relied upon "the presumed medical knowledge at the time [of treatment]" to find a duty to warn the patient's immediate family of a patient's genetically transferable condition. *Safer v. Estate of Pack*, 291 N.J.Super. 619, 677 A.2d 1188, 1192 (App.Div.1996).

Cases such as *Safer*, *Munro*, and *Pate* recognize that the field of genetic counseling is rapidly evolving as new methods of testing become more practical and reliable, and the legal duty of physicians will be driven, at least in part, by the standard of care in the medical profession.[7] As this occurs, it is unlikely that the medical community will adopt a standard of care that is either unduly burdensome or unbeneficial to patients.[8]

Our decision today is informed by the practical reality of the field of genetic testing and counseling; genetic testing and diagnosis does not affect only the patient. Both the patient and her family can benefit from accurate testing and diagnosis. And conversely, both the patient and her family can be harmed by negligent testing and diagnosis.[9] Molloy's experts indicate that a physician would have a duty to inform the parents of a child diagnosed with Fragile X disorder. The appellants admit that their practice is to inform parents in

such a case. The standard of care thus acknowledges that families rely on physicians to communicate a diagnosis of the genetic disorder to the patient's family. It is foreseeable that a negligent diagnosis of Fragile X will cause harm not only to the patient, but to the family of the patient as well. This is particularly true regarding parents who have consulted the physicians concerning the patient's condition and have been advised of the need for genetic testing.

◼ We therefore hold that a physician's duty regarding genetic testing and diagnosis extends beyond the patient to biological parents who foreseeably may be harmed by a breach of that duty. In this case, the patient suffered from a serious disorder that had a high probability of being genetically transmitted and for which a reliable and accepted test was widely available. The appellants should have foreseen that parents of childbearing years might conceive another child in the absence of knowledge of the genetic disorder. The appellants owed a duty of care regarding genetic testing and diagnosis, and the resulting medical advice, not only to S.F. but also to her parents. In recognizing this duty, we apply the principles of negligence law set forth in *Skillings* and *Togstad* and conclude that the duty arises where it is reasonably foreseeable that the parents would be injured if the advice is negligently given. " '[T]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension.' " *Connolly v. Ni-*

---

**7.** *See* Jeri E. Reutenauer, Note, *Medical Malpractice Liability in the Era of Genetic Susceptibility Testing*, 19 Quinnipiac L. Rev. 539, 551 (2000).

**8.** Jeffrey W. Burnett, Comment, *A Physician's Duty to Warn a Patient's Relatives of a Pa-*

tient's *Genetically Inheritable Disease*, 36 Hous. L. Rev. 559, 578–79 (1999).

**9.** *Id.* (citing Theodor Friedmann, *Genetic Therapy, in Human Genome Project: Ethics* 203, 207 (1992)).

collet Hotel, 254 Minn. 373, 381, 95 N.W.2d 657, 664 (1959) (quoting *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 162 N.E. 99, 100 (1928)).

Under our standard of review for summary judgment, there is sufficient evidence in the record to indicate that each of the appellants was on notice that S.F. displayed symptoms of Fragile X but that the testing was never carried out. Drs. Meier and Backus met face-to-face with Molloy and were aware of her specific need for accurate genetic information. Dr. Green did not meet face-to-face with Molloy but that does not relieve her of her duty of reasonable care to the patient and the patient's biological parents to provide accurate genetic testing results. We find sufficient evidence in the record to submit the negligence of each physician to a jury for a determination on whether one or more of the physicians breached the standard of care.

Appellants suggest that recognizing a duty to Molloy would extend a physician's duty to an unreasonable extent, requiring the physician to seek out and inform distant relatives. The court of appeals held that the "physician must notify a biological parent" to discharge his or her duty. *Molloy,* 660 N.W.2d at 453. Molloy concedes that the appellants could have discharged their duty by informing an appropriate contact person, who in this case would be Robert Flomer or Randine Flomer, the custodial parents, or Molloy, the noncustodial biological parent. In light of this concession, the facts of this case, and the limitation of the certified question to whether a duty extends to a minor patient's parents, we need not, and do not, address whether the duty recognized here extends beyond biological parents who foreseeably will rely on genetic testing and diagnosis and therefore foreseeably may be injured by negligence in discharging the duty of care.

## II.

■ We next consider whether Molloy's action is barred by the statute of limitations for medical malpractice actions. Minnesota Statutes § 541.076(b) (2002), states that medical malpractice actions "must be commenced within four years from the date the cause of action accrued." The action in this case was commenced in August 2001, more than four years after S.F.'s last treatment with each of the appellants, but within four years of the date of M.M.'s conception and birth. The question is whether the cause of action accrued on the date of last treatment or at the time of conception of M.M. The court of appeals concluded that the cause of action did not accrue until the time of conception, which was within the four-year statute of limitations. *Molloy,* 660 N.W.2d at 456.

The appellants urge us to reverse the court of appeals and hold that under the "termination of treatment rule" Molloy's cause of action accrued when S.F. ended treatment with the appellants. In the case of a misdiagnosis, the appellants argue that treatment terminates, and the action accrues, on the date of the misdiagnosis. *See Fabio v. Bellomo,* 504 N.W.2d 758, 762 (Minn.1993). Molloy argues that an action cannot be time barred which has not accrued, which she claims occurred at M.M.'s conception, the point at which her claim against the appellants could withstand a motion to dismiss for failure to state a claim upon which relief may be granted.

■ An action does not "accrue" until it may be brought without dismissal for failure to state a claim upon which relief may be granted. *Dalton v. Dow Chemical Co.,* 280 Minn. 147, 152–53, 158 N.W.2d 580, 584 (1968); *see also Herrmann v. McMenomy & Severson,* 590 N.W.2d 641,

643 (Minn.1999) (applying *Dalton* to legal malpractice claim). According to Webster's dictionary, "accrue" is defined as "to come into existence as an enforceable claim: vest as a right." *Webster's New International Dictionary* 13 (3d ed. 1961). In the context of a malpractice action, the action accrues when the plaintiff establishes each of the four elements of negligence. *See Plutshack*, 316 N.W.2d at 5. Therefore, "alleged negligence coupled with the alleged resulting damage is the gravamen in deciding the date when the cause of action accrues." *Offerdahl v. Univ. of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 429 (Minn.1988) (applying *Dalton* to the medical malpractice context).

 In the typical negligence case, there is little doubt about when the action accrues because the breach of duty by the defendant and the plaintiff's resulting injury occur simultaneously. *See Dalton*, 280 Minn. at 151, 158 N.W.2d at 583. In a more straightforward medical negligence case, for example, a discrete surgical error occurs and causes immediate damages—the negligence and the resulting harm occur at a discrete, identifiable point in time. In the context of a long-running relationship between patient and physician, however, where the negligence is a failure to properly diagnose and treat a condition, it may be difficult to determine when in the course of treatment the physician breached a duty. *See Offerdahl*, 426 N.W.2d at 429. To ameliorate this problem, we fashioned the "termination of treatment rule," under which a cause of action for medical malpractice will not accrue until the plaintiff ceases treatment with the defendant physician. *Grondahl v. Bulluck*, 318 N.W.2d 240, 243 (Minn.1982); *Schmitt v. Esser*, 178 Minn. 82, 86, 226 N.W. 196, 197 (1929). This rule is intended to extend the statute of limitations by assuming that the negligent conduct of the physician occurred on the last day of treatment unless the plaintiff's injury was caused by a discrete, identifiable act. *See Offerdahl*, 426 N.W.2d at 429. In other words, the termination of treatment rule establishes the date for the *breach of duty* but it does not answer when the date of *injury* occurs.

In this case, there is no dispute that the alleged breach of duty occurred on the last date of treatment for each physician. However, the cause of action will not accrue until the plaintiff has suffered some injury, so the question is: What is the injury and when did it occur? *See Dalton v. Dow Chem. Co.*, 280 Minn. 147, 153, 158 N.W.2d 580, 584 (1968) (stating that the cause of action accrues and the applicable statute of limitations begins to run as soon as the plaintiff has sustained *some* damage). Molloy's claim is that if Fragile X had been diagnosed in S.F., Molloy would have learned that any future children had a nearly 50 percent likelihood of inheriting the condition, she would have had a tubal ligation, and M.M. would not have been conceived. She claims the damages stem from M.M.'s conception. The appellants argue that based on our decision in *Fabio v. Bellomo*, "some damage occurs as a matter of law when the physician fails to make a correct diagnosis and recommend the appropriate treatment." *Fabio v. Bellomo*, 504 N.W.2d 758, 762 (Minn.1993) (holding that an action for negligent failure to diagnose cancer accrued at the time of misdiagnosis). They argue that this court should "infer" that damage occurred at the time S.F.'s condition was misdiagnosed and her family was not informed of the true nature of her condition.

The court of appeals rejected appellants' argument and distinguished the facts in the instant case from those in *Fabio*. *Molloy*, 660 N.W.2d at 455–56. According to the court, "*Fabio* dealt with [a] condition, cancer, * * * that [grew] progres-

sively worse without treatment. The negligence alleged here is unique in that the failure to order fragile X testing did not make S.F.'s condition progressively worse." *Id.* at 455 (internal citations omitted). We agree with the conclusion of the court of appeals on this point. The misdiagnosis in *Fabio* caused the plaintiff immediate injury in the form of a continually growing cancer, which became more dangerous to the plaintiff each day it was left untreated. The action accrued at the time of misdiagnosis because some damage occurred immediately. In the case of failure to diagnose Fragile X, however, the error does not directly damage the patient and but for the fact that she conceived another child, Molloy would have suffered no damage.

We reaffirm the long-standing principle that malpractice actions based on failures to diagnose generally accrue at the time of the misdiagnosis, because some damage generally occurs at that time. However, where the claim is that if the diagnosis of Fragile X had been properly made a tubal ligation would have been performed and conception avoided, we conclude that damage does not occur until the point of conception, and the cause of action then accrues.[10] *See Sherlock v. Stillwater Clinic,* 260 N.W.2d 169, 175 (Minn.1977) (stating that a plaintiff's injury in a wrongful conception action originates at the point of conception). M.M. was conceived in approximately September 1997 and the suit was initiated in August 2001, within the four-year statute of limitations and, therefore, the action is not time-barred.

### III.

The final certified question concerns whether Minn.Stat. § 145.424 pro-

hibits Molloy's cause of action. The statute provides in pertinent part:

> Subdivision 1. **Wrongful life action prohibited.** No person shall maintain a cause of action or receive an award of damages on behalf of that person based on the claim that but for the negligent conduct of another, the person would have been aborted.

> Subd. 2. **Wrongful birth action prohibited.** No person shall maintain a cause of action or receive an award of damages on the claim that but for the negligent conduct of another, a child would have been aborted.

> Subd. 3. **Failure or refusal to prevent a live birth.** Nothing in this section shall be construed to preclude a cause of action * * * [claiming that] but for the negligent conduct of another, tests or treatment would have been provided * * * which would have made possible the prevention, cure, or amelioration of any disease, defect, deficiency, or handicap.

The appellants argue that Molloy's action is essentially a "wrongful birth" action, and therefore prohibited by section 145.424, subdivision 2 (2002). Molloy contends that the statute prohibits only claims that but for the negligent conduct, an abortion would have been sought. Because Molloy claims that she would have sought a tubal ligation, not an abortion, if the appellants had fulfilled their duty to her, she argues that her claim is not prohibited. The district court held that Molloy's wrongful-conception cause was not prohibited by the statute and the court of appeals agreed, concluding that the plain

---

**10.** The dissent asserts that by our holding we are adopting the discovery rule for medical malpractice cases. We do not hold that the limitations period is tolled. Rather, under the unique facts of this case the limitations period did not *accrue* and begin to run until damage occurred at the time of M.M.'s conception.

language of Minn.Stat. § 145.424 did not bar the action.

 When we interpret statutes, we first determine whether the language of the statute, on its face, is clear or ambiguous. *Gomon v. Northland Family Physicians, Ltd.,* 645 N.W.2d 413, 416 (Minn.2002). A statute is ambiguous if it is susceptible to more than one reasonable interpretation. *Wynkoop v. Carpenter,* 574 N.W.2d 422, 425 (Minn.1998). "Words and phrases are construed * * * according to their common and approved usage." Minn.Stat. § 645.08(1) (2002). However, "[i]f the words of the statute are 'clear and free from all ambiguity,' further construction is neither necessary nor permitted." *Owens v. Water Gremlin Co.,* 605 N.W.2d 733, 736 (Minn.2000).

The plain language of section 145.424 does not support the appellants' contention that Molloy's claim is barred by statute. The statute bars claims that but for the negligence, the pregnancy would have been aborted. Molloy makes no claim that she would have aborted M.M. if she had more accurate information about S.F.'s genetic condition. Rather, Molloy's complaint alleges that "[h]ad [she and her husband] known that [S.F.] had Fragile X, they would not have conceived [M.M.]." This states an action not for wrongful life or birth, but rather for wrongful concep-tion—an action that has been recognized in this state for over a quarter century. *Sherlock,* 260 N.W.2d at 174 (holding that parents may sue physician for damages proximately caused by a negligently performed sterilization procedure).[11] Because Molloy's action is properly characterized as one for wrongful conception rather than wrongful birth, it is not barred by Minn. Stat. § 145.424. We answer this certified question in the negative, and affirm the court of appeals.

Affirmed.

PAGE, J., concurred in part, dissented in part, and filed opinion.

GILBERT, J., took no part in the consideration or decision of this case.

PAGE, Justice (concurring in part, dissenting in part).

I concur in the court's opinion with respect to parts I and III. However, I disagree with the court's attempt to distinguish our relatively recent holding in *Fabio v. Bellomo,* 504 N.W.2d 758 (Minn.1993), to reach a different result based on the facts of this case. In *Fabio,* in the face of Justice Gardebring's dissent, which I joined along with Justice Wahl, the court reiterated the longstanding rule that, in general, a cause of action for medical malpractice accrues

---

11. Justice Simonett articulated the distinction between the two types of actions in his concurrence in *Hickman v. Group Health Plan, Inc.*:

 [T]he interests sought to be compensated are different. In the one case, there is the right not to conceive; in the other, there is the right not to give birth. In the one, it is the right not to have an unplanned child, while in the other it is the right not to have an unwanted child. In the one case, there is no hypothetical exercise of choice of treatment, while in the other case there is.

 396 N.W.2d 10, 17 (Minn.1986) (Simonett, J., concurring specially). Justice Simonett con-cluded that the legislature enacted subdivision 3 to preserve *Sherlock* actions for wrongful conception, while barring "wrongful birth" actions. *Id.* at 18. Professor Dobbs also noted this distinction in his treatise on torts, in which he cited Minnesota's statute as an attempt to abolish claims that but for a physician's negligence, a child would have been aborted, while preserving the cause of action for wrongful conception. *See* Dan B. Dobbs, *The Law of Torts* § 291, at 793 (2000). We adopt the conclusion of Justice Simonett on this point.

when a physician ceases to treat a patient for a particular condition. *Id.* at 762; *see also Grondahl v. Bulluck,* 318 N.W.2d 240, 243 (Minn.1982). In footnote 2 of her dissent, Justice Gardebring noted that, in addition to the continuing course of treatment rule, there are three other exceptions to the rule that the statute of limitations begins to run when treatment ceases in medical malpractice cases. Those exceptions are:

> [T]he discovery rule, which tolls the limitations period until a patient discovered or should have discovered the injury; the fraudulent concealment exception, which tolls the statute until the condition was discovered or should have been discovered when a physician attempts to conceal his or her negligence, and the foreign object exception, which tolls the statute when a foreign object is found inside the body of a patient.

*Fabio,* 504 N.W.2d at 764. And, as Justice Gardebring pointed out, of these exceptions, "Minnesota recognizes only fraudulent concealment as a means of tolling the two-year statute of limitations. *Schmucking v. Mayo,* 183 Minn. 37, 235 N.W. 633 (1931); *Couillard v. Charles T. Miller Hospital, Inc.,* 253 Minn. 418, 92 N.W.2d 96 (1958)."

Now, in its attempt to distinguish *Fabio,* the court, without acknowledging what it is doing, adopts the discovery rule for medical malpractice cases. While I disagreed with our 1993 holding in *Fabio,* stare decisis dictates that we follow it now. *Zettler v. Ventura,* 649 N.W.2d 846, 852 (Minn. 2002) (Anderson, R., J., dissenting) ("While the doctrine of stare decisis is not inflexible, it is not to be abandoned on a whim * * *."). Therefore, I respectfully dissent.