ANDERSON, Justice (dissenting).
At issue here is whether Dr. Richard Dinter owed Nurse Practitioner Sherry Simon's patient Susan Warren a duty of care. Because it was not reasonably foreseeable that Warren, who never met or talked to Dinter, would rely on Dinter's decision, reached in a single phone call between Dinter and Warren's actual treating professional, Simon, there is no legal duty here. I therefore respectfully dissent.
I.
The precise factual scenario Dinter faced was not as simple as the court makes it appear. I briefly recount these facts because our duty inquiry "depends heavily on the facts and circumstances of each case." Doe 169 v. Brandon , 845 N.W.2d 174, 179 (Minn. 2014).
Dinter was called by Simon, a nurse practitioner with whom he had no professional relationship. The "chief complaint" of Simon's patient, Warren, was "exposure to welding smoke over the course of three weeks while she was working at Walmart." During this phone call, Simon told Dinter *381 in "some substance" about her patient, who had "three days of worsening of symptoms with fevers, chills, abdominal pain, cough, and shortness of breath." Simon's preliminary thoughts about the diagnosis centered around infection, because Warren had a high white blood cell count. But Warren also had high blood sugar and low sodium. Simon shared with Dinter that "it was a confusing case" because Warren "complained of the smoke inhalation, making the picture unclear."
Simon had called Walmart and poison control and told Dinter that exposure to welding smoke was "no longer part of the issue." Simon also told Dinter that, despite her testimony that she told him about the patient's symptoms that led to the visit, Warren's exam "was essentially normal." Simon told Dinter that her patient did not have a fever and was in no apparent distress. Simon acknowledged she probably did not tell Dinter about some physical findings from her exam, such as Warren's abdominal bloating. Simon also admitted never communicating to Dinter that she was thinking of taking a chest x-ray. Dinter never received copies of the records or test results to which Simon referred. Simon's testimony reflects that Dinter did not have the ability to access these records on his own. There is also no indication that Dinter ever spoke to or examined Warren.
Simon told Dinter, "I believe she needs to be admitted." According to Simon, Dinter disagreed and said that "the patient did not need to be hospitalized." Dinter's view was that "it sounds like a diabetes that's out of control, treat the diabetes, and see her back in follow-up." Simon indicated that this conversation likely lasted under 10 minutes.
Simon then spoke with her "collaborating physician" Dr. Jan Baldwin. As Simon explained, Baldwin's status as her collaborating physician meant that "if I have any questions or concerns on a case, then I would go directly to her." Simon said she talked to Baldwin because, after speaking with Dinter, she was unclear about how to proceed and was also unclear as to what the "plan of care" for her patient should be. Simon testified, "I specifically asked her about the white count, and she said yes, that can be from the diabetes, get that under control and it will be okay; not in exact words, but that was the end of that conversation." This conversation also lasted 10 minutes or less.
When asked whether she concluded after speaking with Baldwin that hospitalization was unnecessary, Simon responded, "I guess, somehow ... I mean she didn't get admitted." Simon said that "after talking to Dr. Dinter and Dr. Baldwin, it was a conclusion that she had a chronic illness."
Following her discussions with Dr. Dinter and then Dr. Baldwin, Simon instructed Warren about diabetes. She was reassured that Warren did not have a fever, but told Warren if her symptoms worsened "to either call, come back, or go to the ER." She did not tell Warren that she suspected that Warren had an infection. Simon never considered prescribing an antibiotic. She said, "I had two physicians that changed my mind."
II.
We review the district court's grant of summary judgment to determine whether there are genuine issues of material fact and whether the district court erred in its application of the law. Langston v. Wilson McShane Corp. , 828 N.W.2d 109, 113 (Minn. 2013). We "examine the evidence in the light most favorable to the party against whom judgment was granted." Doe 76C v. Archdiocese of Saint Paul & Minneapolis , 817 N.W.2d 150, 163 (Minn. 2012). "To defeat a summary judgment motion, the nonmoving party must come *382 forward with specific facts showing that there are genuine issues for trial." Whiteford ex rel. Whiteford v. Yamaha Motor Corp., U.S.A. , 582 N.W.2d 916, 917 (Minn. 1998).
As a general rule, a person does not owe a duty of care to a third person absent a special relationship or circumstances under which the defendant's conduct creates a foreseeable risk of injury to a foreseeable plaintiff. See 845 N.W.2d at 177-78 ; see also H.B. ex rel. Clark v. Whittemore , 552 N.W.2d 705, 708 (Minn. 1996). We are concerned here only with the second category, whether Dinter's conduct created a foreseeable risk of injury to a foreseeable plaintiff.
Under Minnesota law, "when a person acts in some manner that creates a foreseeable risk of injury to another, the actor is charged with an affirmative duty to exercise reasonable care to prevent his conduct from harming others." Domagala v. Rolland , 805 N.W.2d 14, 26 (Minn. 2011). To determine foreseeability, "we look to the defendant's conduct and ask whether it was objectively reasonable to expect the specific danger causing the plaintiff's injury." Id. at 27. " 'The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension.' " Connolly v. Nicollet Hotel , 254 Minn. 373, 95 N.W.2d 657, 664 (1959) (quoting Palsgraf v. Long Island R.R. , 248 N.Y. 339, 162 N.E. 99, 100 (1928) ).
The court concludes that Dinter's duty and a foreseeable risk of injury to Warren can be established by reason of his one-time, limited discussion with another medical professional: Simon. Factually, the court's analysis is not complicated. Because Simon was unable to admit her patient to Fairview Range Medical Center without Dinter's affirmative decision, the court concludes that Dinter should have foreseen that his decision would be relied on by Simon and her patient, and this decision could harm Simon's patient if made carelessly.[1]
In my view, no duty existed here. Dinter could not have reasonably foreseen based on this single conversation that Simon, who did owe a duty to Warren, would fail to make reasonable treatment decisions regarding her patient, including further infection-related testing of her patient or electing to move her patient to emergency care. Even viewing the evidence in the light most favorable to Warren, the record contains no evidence from which we can infer that it was reasonably foreseeable to Dinter that Simon's single phone call and limited disclosure of information regarding her patient would be determinative in preventing further care for Warren, including hospitalization, if that is what the professional who was actually treating Warren-Simon-deemed necessary for her patient. Concluding that Dinter owed a duty to Warren under these facts stretches foreseeability too far. See Foss v. Kincade , 766 N.W.2d 317, 322 (Minn. 2009) (declining to assess foreseeability based on "any conceivable possibility").
Baldwin's deposition testimony is consistent with the conclusion that it is objectively unreasonable to pin on Dinter the foreseeability of harm to Warren. Baldwin *383 testified that a hospitalist disagreeing with a request for admission "doesn't happen very often," but when it does, a medical professional will select another path to hospitalization. The one time it happened to her, Baldwin "had the patient go to the emergency room at Fairview Range." She had the emergency room observe the patient until "more evidence was acquired" that would confirm the need for hospitalization. Baldwin indicated that sending a patient to the emergency department to be evaluated is always an option. Baldwin's testimony does not support the view that a medical professional such as Simon yields control over her patient to the hospitalist, should defer to the hospitalist's views on how to treat the patient, or should conclude that hospital admission is no longer a treatment option. Yet, apparently, this is what Simon concluded.
In addition, Simon, like Baldwin, did not respond as if the hospitalist's advice was determinative. The record shows that Simon did not rely on Dinter's advice alone. Simon, uncertain about the care plan, sought advice from Baldwin, knowing that Baldwin might disagree with Dinter. Simon testified, "My understanding of the politics-or maybe politics isn't the right word-was that all admissions at that point went through the hospitalists." But Simon's "thought process" was that if she had a "second opinion and then if [Warren] needed to be admitted that possibly Dr. Baldwin could help orchestrate that through the hospitalists." So, even if Simon relied in part on Dinter to jettison her own independent duty to her patient, she did not rely on Dinter alone. In other words, Dinter's hospitalization decision was neither determinative nor the final answer. As Simon testified, "I had two physicians that changed my mind." (Emphasis added.)
We should take Baldwin by her example and Simon at her word. The testimony of Baldwin and Simon shows, generally, that it is not reasonably foreseeable that Warren would rely on Simon's remote, brief telephone consultation with Dinter to establish a duty owed by Dinter to Warren. On these facts, it is objectively unreasonable to assign a duty to Dinter as a matter of law. See Foss , 766 N.W.2d at 322 ("A harm which is not objectively reasonable to expect is too remote to create liability."); see also 845 N.W.2d at 179 (concluding that the link between the defendant's approval of a volunteer's credentials and the victim's injuries from sexual abuse committed by the volunteer "is too attenuated" to "create a foreseeable risk of injury" when the defendant did not employ, control, or supervise the volunteer).
Even if we set aside the testimony of the participants, the structure of hospitalist consultations does not support a duty determination. For example, why one medical professional-the professional with the first-hand, direct knowledge of the patient's condition-would rely on the opinion of a "randomly assigned" physician to make a treatment decision is difficult to ascertain. And that reliance is even less persuasive where the "randomly assigned" physician has neither talked to nor examined that professional's patient, has not seen the patient's medical records, and the case, like here, is "confusing."
There are no disputed facts or differing reasonable inferences to be drawn from the facts that support the court's conclusion that a patient who has never met the hospitalist, let alone requested treatment by that hospitalist, would reasonably rely on the hospitalist's consultation with the patient's treating professional. Thus, summary judgment for Dinter should be affirmed. Whiteford , 582 N.W.2d at 919 (explaining, based on the undisputed facts, that "the danger ... was too remote to impose a duty on [the defendant] and was *384 not one which [the defendant] was required to anticipate or protect against").[2]
III.
By concluding that a duty exists in these circumstances, the court introduces confusion into the law governing tort claims based on professional relationships. The court acknowledges that although Simon worked in a healthcare system that provided for "collaborative management," see Minn. Stat. § 148.171, subds. 3, 6, 11, 13 (2012), Simon's collaborating physician was not her supervisor, and Simon had her own "authority, based on [her] training and licensing, to provide ... direct care" to patients. These points are difficult to reconcile with the court's conclusion that Dinter should have foreseen that his discussion with Simon about her patient's condition-a discussion far less formal than the collaborative relationship between Simon and Baldwin-would be relied on by Simon, and derivatively, by her patient.
The fact that Dinter interacted with another medical professional, who then interacted with the party asserting that a duty was owed, is the critical distinction from the cases cited by the court. None of our previous decisions on which the court relies imposed a duty on a professional in the absence of an actual interaction between that professional and the party that claimed the duty was owed. For example, in Skillings v. Allen , a doctor was "employed by" the parents of a minor child "to treat" the child. 143 Minn. 323, 173 N.W. 663, 663 (1919). In the course of that treatment, the parents asked the doctor questions relevant to their risk of infection from the child's illness. Id . We concluded that the doctor, in responding to the parents' specific inquiry, owed the parents a duty because he "exposed them to danger if they acted on the advice, and [he] was bound to know that they would be likely to follow his advice." Id. at 664 (emphasis added).
I agree that the contractual or non-contractual nature of the relationship between the doctor and the parents in Skillings was irrelevant. But what was relevant, in fact critical, to our decision were the actual interactions of the parents with the doctor and the actual reliance by the *385 parents on the doctor's advice "in visiting their child while sick at the hospital and in taking her from the hospital to her home." Id . at 663. Here, in contrast, Dinter never met with or spoke to Warren about a recommended course of treatment. True, he declined to admit her to the Fairview hospital based on the information Simon provided, but the actual decision to end consideration of hospitalization for Warren was made by Simon, not Dinter. Unlike the doctor in Skillings , Dinter had no reason to know-and certainly was not "bound to know"-that Simon, a medical professional, would conclude an alternate path towards hospitalization such as the emergency room was not needed for her patient. He had no reason to know that Simon would rely on the conversation to abandon her own course of treatment and, for example, decline to order a chest x-ray for her patient.
Our holding in Togstad v. Vesely, Otto, Miller & Keefe , 291 N.W.2d 686 (Minn. 1980) (per curiam), is to the same effect. There, we noted that the plaintiff "went to [the lawyer] for legal advice, was told there wasn't a case, and relied upon this advice in failing to pursue the claim...." Id . at 693. Here again, the presence of a contractual relationship between the client and lawyer was irrelevant. Id. But here again, what was relevant to our decision was that the client "sought and received legal advice from [the lawyer] under circumstances which made it reasonably foreseeable that [the client] would be injured if the advice were negligently given." Id . ; see also Molloy v. Meier , 679 N.W.2d 711, 717 (Minn. 2004) (explaining that "[o]ur decision in Togstad derived from the professional relationship" between the client and the lawyer).[3]
In Molloy , we held that three doctors owed a duty to the biological parents of the doctors' patient-a child-to convey genetic information to those parents about the child's inherited disorder. 679 N.W.2d at 719. As in the two previous cases, the plaintiff in Molloy (one of the parents) "asked [the doctor] to conduct genetic tests on [the child] to determine whether [the child] had inherited any abnormalities from [the parent]." Id . at 714. Following testing, the doctor informed the parent that "test results were 'normal.' " Id . The parent then asked one of the other doctors who evaluated the child "about [the parent's] chances of conceiving another child with [the same genetic] defect," and that doctor told the parent that the possibility was "extremely remote." Id . Based on these facts and others, we considered "whether a physician owes a duty to inform a child's family about the genetic implications of a child's genetic disorder." Id . at 717. We concluded that the doctors owed "a duty of care regarding genetic testing and diagnosis, and the resulting medical advice, not only to [the child] but also to her parents." Id . at 719. In reaching this conclusion, we relied on the "evidence in the record," including evidence *386 that two of the doctors "met face-to-face with" the plaintiff and "were aware of her specific need for accurate genetic information." Id . at 720.[4] Our decision to find that a duty exists was "informed by the practical reality of the field of genetic testing and counseling," which, we recognized, "does not affect only the patient." Id . at 719. We concluded that it was foreseeable that families would rely on the diagnosis of a genetic disorder, particularly "parents who have consulted the physicians concerning the patient's condition." Id . We specifically declined to extend our holding beyond the minor patient's biological parents. Id . at 720.
Dinter's involvement in Warren's patient care looks nothing like the circumstances in these cases. Indeed, it is difficult to conclude that Dinter provided any patient care. He never treated the patient, never saw the patient, and never reviewed a single medical record. This is not to suggest that Dinter's admission decision was either correct or ill-informed. Rather, these undisputed facts demonstrate that there is only one reasonable inference that can be drawn: unlike the cases cited by the court, in which the plaintiff had a direct relationship with the professional, the only relationship here was between two medical professionals. True, Warren was the subject of the communications between those professionals, but Warren did not, as did the plaintiffs in Molloy, Skillings, and Togstad, seek out Dinter's professional opinion. In the absence of any interaction or communication between Dinter and Warren, none of these cases supports the expansive duty the court imposes here.
IV.
Skillings , Togstad , and Molloy show that reliance by persons who seek out the advice of professionals may be reasonably foreseeable even in the absence of an express contractual relationship between those persons. These cases do not, however, address reliance by professionals on the advice of other professionals, the circumstances that prevail here, and for good reason.
As the court of appeals observed, the most immediate result of the court's expansive holding is that hospitalists who wish to avoid liability must "refuse to take calls from other professionals to discuss potential hospitalization of those professionals' patients." Warren v. Dinter , No. A17-0555, 2018 WL 414333, at *4 (Minn. App. Jan. 16, 2018). This new rule is unlikely to serve Minnesotans well, particularly those who may have access to primary health care but lack access to a deep network of medical specialists.
Today's expansion of duty also has a broader impact. The informal conversation that occurred between Simon and Dinter is not unique to the medical profession. Lawyers, accountants, architects, engineers, and other professionals often engage in similar conversations with their colleagues-brief conversations, by telephone, on complicated topics, without formal transfer of paperwork, and without follow-up, that serve as a reasonable means of *387 evaluating professional decisions and judgment calls. Often, the subject of these conversations-the client, the patient, or the customer-is unaware of the exchange. And, just like in this case, the professional that seeks the input of colleagues will take that input into consideration in making final decisions, such as Simon did here in turning to Baldwin and in deciding to discharge Warren without further consideration of hospitalization.
But if these kinds of conversations create a duty, and thus potential liability, then no prudent professional will share insight, ideas, and recommendations with a colleague "without a promise of indemnification," Ford v. Applegate , No. B159756, 2003 WL 22000379, at *7 (Cal. Ct. App. Aug. 25, 2003), as amici persuasively argue. See also Pham v. Black , 347 Ga.App. 585, 820 S.E.2d 209, 212 (2018) (concluding that no physician-patient relationship existed where the hospitalist's "sole involvement with the decedent was consulting with his treating doctors regarding whether he should be admitted ... and ultimately refusing to admit him."). Perversely, the best advice-advice that will be foreseeably relied on-is deterred the most. In other words, as a result of today's expansion of duty, professionals must think twice about giving advice, especially if it is advice worth following.
In the past, we have avoided imposing a legal duty where it would deter actors from taking measures that advance public health, safety, and welfare. See, e.g. , Funchess v. Cecil Newman Corp. , 632 N.W.2d 666, 675 (Minn. 2001) (declining to impose a duty on a landlord related to security measures because it "would tend to discourage landlords from instituting security measures for fear of being held liable for the actions of a criminal"); L&H Airco, Inc. v. Rapistan Corp. , 446 N.W.2d 372, 379 (Minn. 1989) (concluding that an attorney does not owe a duty to a client's adversary because to find that duty would undermine essential elements fundamental to the attorney-client relationship). That same principle should guide us here.
V.
Because the undisputed facts do not support a reasonable inference that Dinter's conduct posed foreseeable harm to Warren, and we have never previously held that a duty exists under similar circumstances, I respectfully dissent.

The court frames the reliance comment from the standpoint of both Simon and Warren. The relevance of Simon's reliance on Dinter's input on the admission question is unclear. Simon has not asserted a claim against Dinter and therefore does not allege that Dinter owed her a duty. The only question here is whether it is reasonably foreseeable that Warren -who apparently never met or talked to Dinter-would rely on Dinter's input on the admission question.

The court translates my dissent as stating, "even if a doctor in the role of hospital gatekeeper breaches the standard of care and bars a patient from the only local hospital, the doctor can reasonably assume-as a matter of law, no less-that this decision will have no consequence." (Emphasis added.) I agree that if Dinter breached the applicable standard of care for hospitalists, his negligence should have consequences. But the court neglects to specify what standard of care Dinter breached.
By "the standard of care," the court may mean the standard offered by Warren's expert, who opined that physicians must "accept and understand that they assume responsibility for the patient's welfare by virtue of agreeing to engage in a substantive conversation with another caregiver." (Emphasis added.) But this is conclusory. Whether Dinter assumed responsibility for Simon's patient by speaking with Simon depends on whether Dinter owed Simon's patient a duty, which is the threshold question before us. 845 N.W.2d at 177 ("The existence of a duty of care is a threshold question because a defendant cannot breach a nonexistent duty."). The court cannot circle back to a standard of care that states Dinter "assume[d] responsibility" for Simon's patient, to conclude that Dinter owed Simon's patient a duty. To do so assumes what is in dispute.
For the reasons I discuss in my dissent, we should decline to recognize a duty here, and hold that professionals do not "assume responsibility for" the clients of other professionals merely by "agreeing to engage in a substantive conversation." Cf. Minneapolis Emps. Ret. Fund v. Allison-Williams Co. , 519 N.W.2d 176, 182 (Minn. 1994) ("Duty in negligence cases may be defined as an obligation, to which the law will give recognition and effect , to conform to a particular standard of conduct toward another." (emphasis added)).

Notably, in Togstad it was not the client's lawyer relying on another lawyer's advice about a potential medical malpractice action; the client's wife relied directly on the lawyer's advice, which triggered the duty for that lawyer to act with care. See 291 N.W.2d at 690. In both Skillings and Togstad , professionals directly advised non-professionals, and reliance was foreseeable. Here, Dinter, a medical professional, advised Simon, another medical professional, who did not treat the advice as determinative but rather conferred with Baldwin, who further advised Simon, who then advised Warren. The foreseeability of harm here, which I agree is the proper standard, differs significantly from the circumstances in Togstad and the other cases cited by the court. "If the connection between the danger and the defendant's own conduct is too remote, there is no duty." 845 N.W.2d at 178. If the circumstances here are not too remote to assign duty, then "remote" has little meaning.

The court is correct that in Molloy , one doctor "did not meet face-to-face" with the plaintiff, but he was the child's treating physician. 679 N.W.2d at 715, 720. This doctor also "conceded that a physician should share the genetic implications of positive genetic test results with the parents of a child diagnosed with an inheritable disorder." Id. at 715. The same cannot be said here. Dinter was not Warren's treating physician, and he has not conceded that he should give his advice to the patients of other medical professionals seeking patient admission to the hospital. Further, it is unclear whether, or how, Dinter could contact Warren; he had never met Warren and reviewed none of her medical records.