**Margaret MacRAE, trustee for the next of kin of Roderick MacRae, Appellant,**

v.

**GROUP HEALTH PLAN, INC., et al., Respondents.**

No. A06–1982.

Supreme Court of Minnesota.

July 31, 2008.

Kay N. Hunt, Lommen, Abdo, Cole, King, Stageberg, P.A., Minneapolis, MN, for appellant.

Charles E. Lundberg, Bassford, Remele, Minneapolis, MN, for respondent.

Mark A. Hallberg, Hallberg & McClain, St. Paul, MN, for amicus, Minnesota Association for Justice.

Diane B. Bratvold, Briggs & Morgan, William M. Hart, Meagher & Geer, P.L.L.P., Minneapolis, MN, for amicus, Minnesota Defense Lawyers Association.

## OPINION

GILDEA, Justice.

Margaret MacRae brought this malpractice action after her husband, Roderick MacRae, died from cancer. The district court dismissed the complaint, finding that

Margaret's claim was barred by the statute of limitations, and the court of appeals affirmed. Because respondents did not meet their burden to show that Margaret incurred compensable damage more than 4 years before she filed this action, we reverse.

The relevant facts in this case are not disputed. On January 15, 2001, Roderick MacRae had a routine physical examination with respondent Dr. Michael Kelly, his primary care physician. During this examination, Dr. Kelly performed a shave biopsy on a lesion on Roderick's left leg and sent the tissue to the pathology department for analysis. Respondent Dr. Amar Subramanian analyzed the tissue sample and reported on January 18 that it was a non-cancerous compound nevus.[1]

More than 18 months after the biopsy, on July 31, 2002, Roderick saw Dr. Kelly due to a bulge in Roderick's right groin. Dr. Kelly diagnosed the bulge as a hernia and referred Roderick to Dr. Steven Mestitz for a surgical consultation. Roderick eventually decided to have the hernia surgically repaired. In preparation for this surgery, Dr. Kelly performed a pre-operative examination of Roderick on December 9, 2002. According to the expert affidavit submitted by Margaret in this case, "[t]he standard of care requires palpitation of both inguinal [groin] lymph nodes as part of the preoperative physical." Roderick's medical records do not indicate that any abnormalities in these lymph nodes were discovered during the December 2002 examination.

On September 15, 2004—approximately 21 months after his hernia surgery and 44 months after the initial biopsy—Roderick saw Dr. Kelly for swelling in Roderick's left leg and groin. A CT scan performed that day indicated that the lymph nodes in Roderick's left groin and pelvic areas were enlarged. Dr. Kelly again referred Roderick to Dr. Mestitz. After two surgical biopsy procedures, Roderick was diagnosed with metastatic malignant melanoma.[2] As a result of this diagnosis, the tissue from the 2001 biopsy of the lesion on Roderick's left leg was re-examined and found to be a malignant melanoma, not a compound nevus as originally diagnosed. An amended pathology report was filed on November 2, 2004, and Roderick was informed of the misdiagnosis the next day.

Roderick died on August 26, 2005. The autopsy report concluded that the cause of death was "extensive metastatic malignant melanoma" that had spread to Roderick's brain, neck, liver, pancreas, small intestine, adrenal gland, and abdominal wall.

On February 20, 2006, Margaret, as trustee for the next of kin of Roderick,

---

1. A nevus is "[a] birth mark or a small growth on the skin, appearing before or shortly after birth, consisting of either blood vessels or skin and connective (supporting) tissue. A nevus is usually pigmented. Same as a mole." 3 J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* N–95 (1995).

2. According to the American Academy of Dermatology:

 Melanoma is a cancer of the pigment producing cells in the skin, known as melanocytes. * * * Normal melanocytes reside in the outer layer of the skin and produce a brown pigment called melanin, which is responsible for skin color. Melanoma occurs when melanocytes become cancerous, grow, and invade other tissues.

 Melanoma begins on the surface of the skin where it is easy to see and treat. If given time to grow, melanoma can grow down into the skin, ultimately reaching the blood and lymphatic vessels, and [s]pread around the body (metastasize), causing life-threatening illness. It is curable when detected early, but can be fatal if allowed to progress and spread.

 American Academy of Dermatology, Malignant Melanoma, http://www.aad.org/public/publications/pamphlets/sun_malignant.html (last visited July 16, 2008).

sued Dr. Kelly and Dr. Subramanian—as well as their employers, respondents Group Health Plan, Inc., and HealthPartners, Inc.—for medical malpractice. The complaint alleged that Roderick "would have, more likely than not, survived his illness" if the initial 2001 biopsy had been correctly read and that "within four years of the date of this Complaint, Roderick MacRae's illness progressed to the point where it was no longer more likely that he would have survived his illness."

The defendants moved for summary judgment, arguing that the 2001 misdiagnosis was a discrete act of negligence and that the medical malpractice suit is therefore barred by the 4–year statute of limitations. In support of their motion, the defendants submitted Roderick's medical records but did not offer any expert evidence regarding the growth or spread of his melanoma between the 2001 misdiagnosis and the eventual correct diagnosis in 2004.

Margaret responded that her claim is not barred because "the cause of action did not accrue until [Roderick's] cancer reached the point where he could not survive." In an affidavit submitted to the district court, a medical expert retained by Margaret indicated that melanoma that originates in the left leg will first become metastatic in the inguinal lymph node. Because no abnormality was noted in these lymph nodes during Roderick's December 2002 pre-operative examination, the expert concluded that Roderick's cancer likely had not yet metastasized and he likely would have survived if his cancer had been discovered and treated at that time. In the alternative, Margaret argued that her claim was not barred because the misdiagnosis was part of a course of treatment of Roderick's leg and skin condition that did not terminate more than 4 years before Margaret commenced the action.

The district court ordered summary judgment for the defendants. The court noted that "[t]here is a 'longstanding principle that malpractice actions based on failures to diagnose generally accrue at the time of the misdiagnosis, because some damage generally occurs at that time.'" (Quoting *Molloy v. Meier*, 679 N.W.2d 711, 722 (Minn.2004.)) Because "the particular lesion biopsied by Dr. Kelly healed and Dr. Kelly did nothing more for this specific ailment," the court also found that there was no continuing course of treatment and that the single act rule applied. The court therefore concluded that Margaret's cause of action accrued on January 17, 2001 [3]— the date of the misdiagnosis—and that her "claim is time barred by the applicable statute of limitations."

Margaret appealed, arguing that her cause of action did not accrue until after December 2002. Margaret argued that she did not suffer legally compensable damage until it became more likely than not that Roderick would not survive his disease, and that this happened within the 4–year limitations period.[4] *MacRae v. Group Health Plan, Inc.*, No. A06–1982, 2007 WL 2417167, at *3 (Minn.App. Aug.28, 2007). The court of appeals noted that we had previously stated in dicta that

---

3. The district court stated that "[o]n January 17, 2001, Dr. Subramanian's pathology report stated that * * * the left leg specimen was a compound nevus" and that the misdiagnosis of Roderick's lesion "occurred on or about January 17, 2001." But it appears that the tissue sample from Roderick's biopsy was received by the pathology department on January 17 and that the report and diagnosis were made on January 18.

4. Margaret appears to have abandoned her argument that there was a continuing course of treatment. *See MacRae v. Group Health Plan, Inc.*, No. A06–1982, 2007 WL 2417167, at *2 n. 1 (Minn.App. Aug.28, 2007).

a misdiagnosis of cancer caused " 'immediate injury in the form of a continually growing cancer, which became more dangerous to the plaintiff each day it was left untreated. The action accrued at the time of misdiagnosis because some damage occurred immediately.' " *Id.* (quoting *Molloy*, 679 N.W.2d at 722). The court of appeals concluded that these statements "strongly imply that as a matter of law, a misdiagnosis of cancer causes some damage resulting in accrual of a medical-malpractice claim as of the date of misdiagnosis." *Id.* Accordingly, the court held that "the district court did not err in concluding that an action for malpractice brought at that time would have withstood a Rule 12.02(e) motion for dismissal on the pleadings and therefore accrued at the time of misdiagnosis," and it affirmed summary judgment. *Id.* at *4. We granted Margaret's petition for review.

## I.

■ This case comes to us on review of the entry of summary judgment. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. When reviewing dismissal of a claim on summary judgment, we examine the record to determine (1) "whether there are any genuine issues of material fact," and (2) "whether the district court erred in its application of the law." *Antone v. Mirviss*, 720 N.W.2d 331, 334 (Minn.2006).

## A.

■ The parties agree that the factual record is undisputed, so the only issue before us is whether those undisputed facts establish that Margaret's claim is barred by the applicable statute of limitations. The construction and application of a statute of limitations, including the law governing the accrual of a cause of action, is a question of law and is reviewed de novo. *Antone*, 720 N.W.2d at 334; *State Farm Fire & Cas. v. Aquila Inc.*, 718 N.W.2d 879, 883 (Minn.2006). Because an assertion that the statute of limitations bars a cause of action is an affirmative defense, the party asserting the defense has the burden of establishing each of the elements. *Aquila*, 718 N.W.2d at 885.

The statutory limitations period that governs Margaret's medical malpractice action is set forth in Minn.Stat. § 541.076(b) (2006): "An action by a patient or former patient against a health care provider alleging malpractice, error, mistake, or failure to cure, whether based on a contract or tort, must be commenced within four years from the date the cause of action accrued." *See also* Minn.Stat. § 573.02, subd. 1 (2006) (allowing a trustee to maintain a wrongful death action for medical malpractice on behalf of the next of kin if the action is commenced within 3 years of the death and satisfies the timing requirement in section 541.076).[5] Although the limitations period begins to run when the cause of action accrues, the statute does not define when such accrual occurs.

■■ In *Dalton v. Dow Chemical Co.*, 280 Minn. 147, 153, 158 N.W.2d 580, 584 (1968), we construed a statute of limitations similar to the one at issue here and held that a cause of action accrues "at such time as it could be brought in a court

---

**5.** The present wrongful death action was commenced on February 20, 2006, less than 6 months after Roderick's death. Thus, the only question in this case is whether the action satisfies the timing requirement in Minn. Stat. § 541.076.

of law without dismissal for failure to state a claim." *See also Antone,* 720 N.W.2d at 335; *Herrmann v. McMenomy & Severson,* 590 N.W.2d 641, 643 (Minn.1999). Thus, the limitations period begins to run when the plaintiff can allege each of the essential elements of a claim. *Molloy v. Meier,* 679 N.W.2d 711, 721 (Minn.2004). The essential elements for medical malpractice claims are: "(1) the standard of care recognized by the medical community as applicable to the particular defendant's conduct, (2) that the defendant in fact departed from that standard, and (3) that the defendant's departure from the standard was a direct cause of [the patient's] injuries." *Plutshack v. Univ. of Minn. Hosps.,* 316 N.W.2d 1, 5 (Minn.1982); *see also Molloy,* 679 N.W.2d at 720–22 (stating that a cause of action does not accrue until both the negligent act and the resulting injury have occurred). The parties do not contest, for purposes of summary judgment, that there are no genuine issues of material fact as to the applicable standard of care and whether the defendants departed from that standard in misdiagnosing Roderick's lesion in 2001. Accordingly, the question presented in this case focuses on when the misdiagnosis caused Roderick (and therefore Margaret) to suffer compensable damages.

### B.

Both the district court and the court of appeals relied on our decision in *Molloy* in concluding that Margaret's claim was barred by the statute of limitations. The respondents argue that we "definitively held" in *Molloy* that "some damage" necessarily occurs, and the statutory limitations period necessarily begins to run, at the time of a negligent misdiagnosis of cancer. Amici curiae Minnesota Medical Association and Minnesota Defense Lawyers Association argue that our holding in *Fabio v. Bellomo,* 504 N.W.2d 758, 762 (Minn.1993), also presumes that "some damage" occurs at the time of a cancer misdiagnosis. We therefore examine these cases to determine whether we have previously held, as the district court and court of appeals appear to have concluded, that, as a matter of law, "some damage" occurs, and a cause of action accrues, immediately upon a negligent misdiagnosis of cancer.

In *Fabio v. Bellomo,* Fabio alleged that her primary care physician, Dr. Bellomo, noticed a lump in her breast during an examination between 1982 and 1984, and again during an examination in 1986, but that he did not order a mammogram or perform any other medical tests on the lump. 504 N.W.2d at 760. After another doctor noticed the lump during a later examination and ordered a mammogram and biopsy, Fabio was diagnosed with breast cancer. *Id.* The tumor was surgically removed and Fabio underwent chemotherapy. *Id.* She subsequently sued Dr. Bellomo for medical malpractice in failing to diagnose the lump during the 1986 examination. *Id.* The district court granted summary judgment in favor of Dr. Bellomo because Fabio failed to establish that Dr. Bellomo's negligence during the 1986 examination caused any damages. *Id.* at 761. The court also denied Fabio's motion to amend her complaint to include a medical malpractice claim relating to the 1982–84 examination because such a claim was barred by the statute of limitations. *Id.*

On appeal, Fabio argued that she should have been allowed to amend her complaint to include Dr. Bellomo's failure to order further testing on the lump during the 1982–84 examination because that conduct was part of a continuing course of treatment. *Id.* at 761–62. We had previously held that a breach of the applicable standard of care that occurs during a course of treatment for a particular condition is not

deemed to have occurred until the patient's treatment for that condition ceased. *See Offerdahl v. Univ. of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988). But we had also held that this "termination of treatment" rule does not apply when a patient's injury was caused by a single discrete and identifiable act by the physician. *See id.* at 428–29 Although Fabio attempted to invoke the termination of treatment rule, we held that any claim relating to the 1982–84 examination was barred because that examination was a discrete act and "not part of a continuing course of treatment" with the 1986 examination. *Fabio*, 504 N.W.2d at 762. We therefore affirmed the district court's decision not to allow Fabio to amend her complaint to add a claim based on the 1982–84 alleged failure to treat.[6] *Id.*

In *Molloy v. Meier*, Molloy asked Dr. Meier to conduct genetic tests on Molloy's daughter, who was developmentally delayed, to determine whether she had inherited any abnormalities from Molloy. 679 N.W.2d at 714. Dr. Meier intended to order, among other tests, a test for Fragile X syndrome, but the Fragile X testing was never performed. *Id.* Molloy was informed that the test results were "normal," but was not told that the Fragile X test had not been performed. *Id.* Dr. Meier referred the child to Dr. Backus for evaluation. *Id.* After Molloy asked about the likelihood of conceiving another child with the same defect, Dr. Backus responded that "[her daughter's] problems were not genetic in origin and the risk that Molloy might give birth to another child like [her daughter] was extremely re-

mote." *Id.* Approximately 6 years later, Molloy gave birth to a son who exhibited the same developmental delays as her daughter, and subsequent genetic testing showed that her son had Fragile X syndrome. *Id.* at 715. Molloy and her daughter were then tested and found to carry the genetic disorder. *Id.*

Molloy sued the doctors who performed the initial genetic testing, arguing that she would not have conceived her second child if she had known she was a carrier of Fragile X syndrome. *Id.* The doctors argued that the cause of action was time-barred because " 'some damage occurs as a matter of law when the physician fails to make a correct diagnosis and recommend the appropriate treatment.' " *Id.* at 721 (quoting *Fabio*, 504 N.W.2d at 762). Although we "reaffirm[ed] the long-standing principle that malpractice actions based on failures to diagnose generally accrue at the time of the misdiagnosis, because some damage generally occurs at that time," we held that under the facts in *Molloy*, no damage occurred until the second child was conceived. *Id.* at 722. In reaching this conclusion, we attempted to distinguish *Fabio* as follows: "The misdiagnosis in *Fabio* caused the plaintiff immediate injury in the form of a continually growing cancer, which became more dangerous to the plaintiff each day it was left untreated. The action accrued at the time of misdiagnosis because some damage occurred immediately." *Id.*

We recognize that our attempt to distinguish *Fabio* from the facts in *Molloy* suggested a per se rule that a cause of action for the misdiagnosis of cancer accrues, and

---

**6.** The dissent in *Fabio* would have construed the 1982–84 examination as part of a continuing course of treatment with the 1986 examination. 504 N.W.2d at 765 (Gardebring, J., dissenting) ("I can only conclude that there was a continuing course of treatment * * *.") We have no occasion in this case to address the continuing course of treatment rule because Margaret did not appeal the district court's finding that there was no continuing course of treatment. We therefore treat the date of the misdiagnosis of Roderick's lesion, January 18, 2001, as the date of the negligent act relevant to this case.

the statutory limitations period begins to run, at the time of the negligent misdiagnosis. But *Molloy* did not involve a cancer misdiagnosis, and our statement that a cause of action accrues immediately upon such a misdiagnosis was not necessary to our holding in that case. That statement therefore is not binding precedent. *See Vandenheuvel v. Wagner*, 690 N.W.2d 753, 755–56 (Minn.2005); *State ex rel. Foster v. Naftalin*, 246 Minn. 181, 208, 74 N.W.2d 249, 266 (1956).

Moreover, after re-examining *Fabio*, we conclude that our attempt to distinguish the facts in *Molloy* read too much into our decision in *Fabio*. Our analysis of the statute of limitations issue in *Fabio* was limited to whether the 1982–84 examination was a discrete act or whether that examination was part of a continuing course of treatment. *Fabio*, 504 N.W.2d at 762. Thus, our analysis addressed only the date of the negligent act, not the date of any damage resulting from the act. Although it may be possible to infer from our analysis a conclusion that some damage necessarily occurs at the same time as a misdiagnosis of cancer, our review of the briefs submitted in *Fabio* suggests that neither party addressed the date of damage in their argument regarding the accrual of the cause of action in that case. Accordingly, such an inference would read into our analysis a decision on an issue that was not raised by the parties and that we did not purport to decide. To the extent that our discussion of *Fabio* in the dicta in *Molloy* suggests that we adopted a broad rule of law that some damage necessarily occurs at the time of a cancer misdiagnosis, we clarify that these dicta read too much into *Fabio*. We therefore conclude that we have not previously decided whether a cause of action accrues as a matter of law immediately upon a negligent misdiagnosis of cancer.

## II.

Because we have not previously decided whether some damage occurs as a matter of law at the time of a cancer misdiagnosis, we now turn to whether we should adopt such a rule in this case. Courts use different approaches to determine when injury or damage occurs for purposes of accrual of a cause of action. For example, the "occurrence" approach "assumes that nominal damages occur, the cause of action accrues, and the statute of limitations begins to run, simultaneously with the performance of the negligent or wrongful act." *Antone*, 720 N.W.2d at 335. The "discovery" approach, on the other hand, provides that a cause of action does not accrue until "the plaintiff knows or should know of the injury." *Id.*

Both of these approaches, however, are inconsistent with our long-standing precedent. We have repeatedly held that a negligent act is not itself sufficient for a negligence cause of action to accrue. *Dalton*, 280 Minn. at 152–53, 158 N.W.2d at 584; *Golden v. Lerch Bros., Inc.*, 203 Minn. 211, 220–21, 281 N.W. 249, 253–54 (1938); *see also Offerdahl*, 426 N.W.2d at 429 ("Alleged negligence *coupled with the alleged resulting damage* is the gravamen in deciding the date when the cause of action accrues." (emphasis added)). We have also held that ignorance of a cause of action does not toll the running of the statutory limitations period. *Herrmann*, 590 N.W.2d at 643; *Dalton*, 280 Minn. at 153, 158 N.W.2d at 584.

Accordingly, we have rejected both the occurrence and discovery approaches in favor of a "middle ground"— the "damage" rule of accrual. *Antone*, 720 N.W.2d at 335–36. Under this approach, a cause of action accrues when some injury or damage from the negligent act actually occurs. *Id.* at 336; *see also Herrmann*,

590 N.W.2d at 643 (holding that it is the occurrence of "some" damage, and not "the ability to ascertain the exact amount of damages," that triggers the accrual of a cause of action and running of the limitations period). The damage triggering the accrual of a negligence cause of action may be any damage caused by the negligent act and is not limited to the damage or cause of action "specifically identified in the complaint." *Antone,* 720 N.W.2d at 336. But the damage must be *"compensable* damage," not just some abstract damage. *Id.* (emphasis added); *see also K.A.C. v. Benson,* 527 N.W.2d 553, 561 (Minn.1995) (noting that "the breach of a legal duty without compensable damages recognized by law is not actionable").

█ Thus, consistent with our precedent, in order to justify a rule that a cause of action accrues as a matter of law at the time of a cancer misdiagnosis, we would have to conclude that some legally compensable damage necessarily occurs at the time of such a misdiagnosis. We decline to adopt such a broad rule of law. Rather, consistent with our precedent and the precedents in other states that apply a "damage" rule for the accrual of a cause of action, we believe that the limitations inquiry in cancer misdiagnosis cases should be conducted based on the unique record developed in each particular case.

This case-by-case approach is consistent with our precedent suggesting that the continued presence of cancer following a negligent misdiagnosis, by itself, may not be compensable damage. *See Leubner v. Sterner,* 493 N.W.2d 119, 120 (Minn.1992). In *Leubner,* a patient claimed that a 6–month delay in the diagnosis of her breast cancer reduced her chance of survival. The issue before us on appeal was whether the patient had established, for purposes of surviving summary judgment, that the misdiagnosis had caused any damages. *Id.* at 121. We held that the plaintiff's claim failed because she did not present any evidence of any compensable damage that resulted from the continued presence and growth of the cancerous tumor in her body. *Id.* In considering the unchecked growth of the cancer in the patient's body as a potential theory of damages, we stated, "[P]laintiffs contend that the claimed injury is 'the enlarged, unchecked tumor.' But the tumor was removed in February 1988, just as it would have been removed 7 months earlier. It is unclear what the damages would be for removal of a larger rather than a smaller tumor." *Id.* We do not construe our language to mean that the continued presence of a cancerous tumor could *never* give rise to a cause of action. But the result in *Leubner* suggests that the presence of the tumor is not *itself* compensable damage.

Additionally, courts in other jurisdictions that apply a "damage" rule of accrual have held, as we suggested in *Leubner,* that the continued presence of cancer is not itself sufficient for a cause of action to accrue and the statutory limitations period to begin running. In *St. George v. Pariser,* 253 Va. 329, 484 S.E.2d 888, 889 (1997), a doctor performed a biopsy on a mole and concluded that the tissue was benign. Nearly 2 years later, the tissue was re-examined and found to contain a melanoma in the epidermis.[7] *Id.* at 889–90. The entire mole was then removed, and the melanoma was found to have spread to the dermis. *Id.* The record indicated that the melanoma would have been curable *if it* had been completely removed at the time of the initial biopsy, but that after it spread to the dermis, removal could not

---

**7.** Skin is comprised of two parts: an outer layer called the epidermis, and a deeper layer called the dermis. *See* 4 Schmidt, *supra,* at S–124–25.

ensure that the cancer would not recur in another part of the body. *Id.* at 890. The Virginia Supreme Court concluded:

> [The plaintiff's] actionable injury was not the generic disease of cancer or the cancer "in situ" which she had when she sought evaluation of the mole in 1991. [The doctor's] negligence could not have been the cause of that medical condition. [The plaintiff's] injury was the change in her cancerous condition which occurred when the melanoma altered its status as "melanoma in situ," a biologically benign condition, to "invasive superficial spreading malignant melanoma" in the dermis which allowed the melanoma cells to metastasize to other parts of the body.

*Id.* at 891. Because the record did not establish that the injury had occurred outside of the limitations period, the court held the doctor had "wholly failed to meet his burden of proof to sustain his statute of limitations plea." *Id.*

Similarly, in *DeBoer v. Brown*, 138 Ariz. 168, 673 P.2d 912, 913 (1983), a doctor biopsied a patient's lesion in 1976 and diagnosed the tissue as a compound nevus or common wart. But after the patient was diagnosed with a malignant melanoma in April 1980, the tissue from the 1976 biopsy was re-examined and found to be a melanoma. *Id.* The record indicated that the melanoma had "begun to grow internally sometime during 1979." *Id.* The Arizona Supreme Court concluded:

> Where a medical malpractice claim is based on a misdiagnosis or a failure to diagnose a condition, the "injury" is not the mere undetected existence of the medical problem at the time the physician misdiagnosed or failed to diagnose it. Nor is the "injury" the mere continuance of the same problem in substantially the same state or the leaving of

the patient "at risk" of developing a more serious condition. Rather, the "injury" is the development of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment.

*Id.* at 914. Applying this rule to the facts before it, the court held that the injury occurred, and the statute of limitations began to run, in 1979, when the lesion began to grow. *Id.* at 913–15.

 We agree with the reasoning of the Virginia and Arizona courts and conclude that the continued presence of cancer—by itself—is not evidence of compensable damage in a malpractice action for negligent misdiagnosis. As we indicated in *Molloy*, we have long recognized that "some damage" usually occurs at the time of a misdiagnosis. 679 N.W.2d at 722. But we also acknowledged in *Molloy* that this general principle is not applicable to every case. *Id.* Given the complexities associated with the development of a disease like cancer, and the variety of ways that such a disease may manifest itself in a particular patient, we cannot say that some compensable damage necessarily occurs as a matter of law at the time of every negligent misdiagnosis of cancer. To adopt a blanket rule that such damage occurs as a matter of law at the time of a misdiagnosis of cancer would turn our "damage" rule of accrual into an "occurrence" rule for this narrow class of cases. We decline to adopt such a rule in this case. Rather, as in other medical malpractice cases, we conclude that a court must determine when a cause of action accrues in cases of misdiagnosis of cancer by looking at the unique circumstances of the particular case to determine when some compensable damage occurred as a result of the alleged negli-

gent misdiagnosis.[8]

### III.

Having declined to adopt a blanket rule that "some damage" occurs as a matter of law at the time of a cancer misdiagnosis, we must determine whether the respondents in this case established that Roderick suffered some compensable damage more than 4 years before Margaret commenced her medical malpractice action. Margaret argues that no compensable damage can occur in a cancer misdiagnosis case until it is more likely than not that the patient will not survive the disease. Based on the affidavit testimony of her medical expert that the results of Roderick's preoperative examination in December 2002 indicate that he likely would have survived his melanoma if it had been properly treated at that time, Margaret argues that her claim is timely under such a rule.

Margaret supports her argument with cases in which we have rejected several theories of damage or potential damage that may result from a misdiagnosis of cancer. Margaret cites *Leubner*, where, while considering whether the patient had established that any damages were caused by the negligent act, we declined to recognize "negligent aggravation of a preexisting condition" as a legally compensable injury. 493 N.W.2d at 122. She also relies on *Fabio*. In *Fabio*, as in *Leubner*, we considered whether there was sufficient evidence of causation to sustain Fabio's malpractice claim arising from the 1986

examination. *Fabio*, 504 N.W.2d at 762–63. We rejected "loss of chance" due to reduced life expectancy and increased risk of recurrence as a theory of compensable damages, and reaffirmed our rejection of "negligent aggravation of a preexisting condition." *Id.*

 We agree that a patient suffers compensable damage from a negligent misdiagnosis of cancer when it becomes more likely than not that he will not survive the disease. But we do not agree that this is the only possible compensable damage in such cases. As we have previously recognized, the accrual of a cause of action for professional malpractice is not limited to the damage or cause of action "specifically identified in the complaint." *Antone*, 720 N.W.2d at 336. Although the continued presence of a patient's cancer alone might not be compensable damage, the progression of the disease may require the patient to undergo a different course of treatment or to incur additional medical expenses. Moreover, the continued presence of the cancer may cause the patient to suffer pain, loss of bodily functions, or some other damage. Any of these developments, and undoubtedly other scenarios that we have not mentioned, could be a compensable injury that would result in the accrual of a cause of action for medical malpractice if that injury is substantiated by evidence in the record.

We therefore decline Margaret's invitation to hold that no compensable damage can occur in a cancer misdiagnosis case

---

8. Amicus curiae Minnesota Association for Justice suggests that our rules governing the accrual of a cause of action "require[ ] that plaintiff have a meaningful opportunity to have *knowledge of the facts upon which the claim is based* and that accrual cannot occur until *all* the elements of the cause of action can be established." (First emphasis added.) This language implies a "discovery" rule of accrual, which we have consistently declined to adopt. *See Antone*, 720 N.W.2d at 335–36; *Herrmann*, 590 N.W.2d at 643; *Dalton*, 280 Minn. at 152–53, 158 N.W.2d at 584. We again reject such a rule today and emphasize that the relevant inquiry is not when the plaintiff has knowledge of damage caused by the misdiagnosis of cancer, but rather when such damage occurs within the patient's body.

until it is more likely than not that the patient will not survive the disease. As we held above, the determination of the accrual of a cause of action for negligent misdiagnosis of cancer must be based on the facts and circumstances of each case. Where the record reflects that some damage was suffered because of the negligent act, the cause of action has accrued for statute of limitations purposes.

 In this case, the district court made a legal conclusion that the cause of action accrued and the statute of limitations began to run at the time of the misdiagnosis. Based on this conclusion, the court did not make any findings regarding whether there is an issue of material fact as to when Roderick suffered a legally compensable injury caused by the misdiagnosis of his cancer. Based on our own review of the record, we conclude that respondents did not establish that Roderick suffered some damage more than 4 years before February 20, 2006, when Margaret commenced this action. Respondents did not offer any expert evidence regarding the growth or spread of Roderick's melanoma between the 2001 misdiagnosis and the eventual correct diagnosis in 2004. They instead supported their motion with copies of Roderick's medical records. But those records do not establish that Roderick suffered damage from the misdiagnosis before February 20, 2002 (4 years before this action was commenced).

Respondents also point to the affidavit of the expert Margaret retained to support their argument that Roderick incurred some damage after the January 18, 2001, misdiagnosis. Specifically, respondents point to this expert's acknowledgement that Roderick's disease had a "natural progression" from the time of the misdiagnosis. But the question is whether the natural progression of the cancer had consequences that constitute compensable damages before February 20, 2002, and the record is barren on that issue.

In sum, based on our review of the record we hold that respondents have not met their burden of establishing that Roderick suffered compensable damages from the misdiagnosis prior to February 20, 2002. We therefore reverse the decision of the court of appeals and remand to the district court for further proceedings consistent with this opinion.

Reversed and remanded.

MAGNUSON, C.J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.