[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No.  16-10119
_____

D.C. Docket Nos.  4:08-md-02004-CDL,
4:12-cv-00307-CDL

DEBORAH ANN ROGERS,

Plaintiff-Appellant,

versus

MENTOR CORPORATION,
MENTOR LLC,

Defendants-Appellees.

_____

No. 16-10120

_____

D.C. Docket Nos. 4:08-md-02004-CDL,
4:12-cv-00319-CDL

VICTORIA KEARSE,

                                                  Plaintiff-Appellant,

                          versus

MENTOR CORPORATION,
MENTOR LLC,

                                                  Defendants-Appellees.

_____

No. 16-10122

_____

D.C. Docket Nos. 4:08-md-02004-CDL,
4:12-cv-00323-CDL

SAMANTHA SHIREY,
BRIAN SHIREY,

                                                  Plaintiff-Appellants,

                          versus

MENTOR CORPORATION,
MENTOR LLC,

                                                  Defendants-Appellees.

2

_____

No. 16-10124

_____

D.C. Docket No. 4:08-md-02004-CDL,
4:13-cv-00048-CDL

BETTY LOU SHAFFER,

Plaintiff-Appellant,

versus

MENTOR CORPORATION,
MENTOR LLC,

Defendants-Appellees.

_____

No. 16-10351

_____

D.C. Docket Nos. 4:08-md-02004-CDL,
4:13-cv-00093-CDL

MICHELE RENE JACKSON,

Plaintiff-Appellant,

versus

MENTOR CORPORATION,

3

MENTOR LLC,

Defendants-Appellees.

_____

No. 16-10354

_____

D.C. Docket Nos. 4:08-md-02004-CDL,
4:13-cv-00101-CDL

ANDREA JEAN RUPERT,

Plaintiff-Appellant,

versus

MENTOR CORPORATION,
MENTOR LLC,

Defendants-Appellees.

_____

No. 16-10355

_____

D.C. Docket Nos. 4:08-md-02004-CDL,
4:13-cv-00153-CDL

CARRIE M. KLUM,
ANTHONY D. KLUM,

4

Plaintiffs-Appellants,

versus

MENTOR CORPORATION,
MENTOR LLC,

Defendants-Appellees.

_____

No. 16-10356

_____

D.C. Docket Nos. 4:08-md-02004-CDL,
4:13-cv-00346-CDL

ROSA GRACIELA URBIETA,
MATEO URBIETA,

Plaintiffs-Appellants,

versus

MENTOR CORPORATION,
MENTOR LLC,

Defendants-Appellees.

_____

No. 16-10357

_____

5

D.C. Docket Nos. 4:08-md-02004-CDL,
4:14-cv-00061-CDL

LIBBY M. HALL,

Plaintiff-Appellant,

versus

MENTOR CORPORATION,
MENTOR LLC,

Defendants-Appellees.

_____

No. 16-11519

_____

D.C. Docket Nos. 4:08-md-02004-CDL,
4:12-cv-00311-CDL

CHRISTINA P. LATTA,

Plaintiff-Appellant,

versus

MENTOR CORPORATION,

MENTOR LLC,

Defendants-Appellees.

_____

No. 16-11520

_____

D.C. Docket Nos. 4:08-md-02004-CDL,
4:13-cv-00092-CDL

MARGIE H. GREENMAN,

Plaintiff-Appellant,

versus

MENTOR CORPORATION,
MENTOR LLC,

Defendants-Appellees.

_____

No. 16-12841

_____

D.C. Docket Nos. 4:08-md-02004-CDL,
4:13-cv-00027-CDL

MELISSA WATSON ROBINSON,

Plaintiff-Appellant,

7

versus

MENTOR CORPORATION,
MENTOR LLC,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Middle District of Georgia
_____

(March 9, 2017)

Before WILSON and JILL PRYOR, Circuit Judges, and BUCKLEW,[*] District Judge.

WILSON, Circuit Judge:

Plaintiffs filed claims against Mentor Corporation and Mentor LLC (collectively, "Mentor") for products liability and negligence. Plaintiffs asserted that Mentor's product, ObTape Transobturator Tape (ObTape), a transvaginal mesh product designed to treat urinary incontinence, caused them to suffer injuries. Mentor moved for summary judgment, asserting that Plaintiffs' claims were time barred under Minnesota's statutes of limitation for tort claims. The district court granted summary judgment to Mentor.

On appeal, Plaintiffs argue that the district court erred when it concluded that the Plaintiffs knew of a connection between the ObTape and their injuries

_____

[*]Honorable Susan C. Bucklew, United States District Judge for the Middle District of Florida, sitting by designation.

8

more than six years before they brought suit.[1] We conclude that because Minnesota law requires a plaintiff to know of a *causal* connection, and not just a mere connection, the district court erred in dismissing Plaintiffs' claims as time barred. Applying the discovery rule to Plaintiffs' claims, a reasonable jury could conclude that Plaintiffs did not know of a causal connection between the ObTape and their injuries more than six years before filing suit. Therefore, we reverse and remand for further proceedings consistent with this opinion.

## I.    BACKGROUND

This appeal stems from personal injury lawsuits brought by twelve Plaintiffs against Mentor for its product, ObTape. ObTape is a transvaginal mesh (also called a suburethal sling) used to treat stress urinary incontinence. Plaintiffs each sought treatment for stress urinary incontinence and subsequently were implanted with the ObTape. At some point, each Plaintiff experienced injuries and underwent a procedure to remove some or all of the ObTape.

Plaintiffs allege that when Mentor launched ObTape in 2003 Mentor was fully aware that the product could erode and cause serious infections, but Mentor fraudulently concealed this information from the medical community. The

---

[1] In their initial case, Plaintiffs also brought claims against Mentor for fraudulent concealment. Those claims were dismissed as time barred at summary judgment. This appeal is only for Plaintiffs' negligence and strict liability claims, not their fraud claims. In this appeal, Plaintiffs continue to assert fraudulent concealment as a defense to toll the statute of limitations. However, because we conclude that the district court misapplied the statute of limitations rule, we need not address Plaintiffs' fraudulent concealment defense.

product-insert data sheets (PIDs) that accompany ObTape when it is given to doctors listed infection and erosion as rare events. In early 2006, after receiving numerous reports of adverse events, Mentor withdrew ObTape from the market.

## I.    Melissa Robinson Watson

Plaintiff Melissa Robinson Watson sought treatment for stress urinary incontinence and received her ObTape implant in May 2004. Watson experienced negative side effects within 25 days of receiving her ObTape implant. It was partially removed two weeks later. After viewing a television commercial regarding transvaginal mesh complications, she filed her lawsuit in January 2013.

Watson has suffered from diabetes since she was 17, and before her ObTape implant surgery, her doctor warned her that her diabetes could cause complications. Therefore, when she began to experience erosion and infection, she attributed it to her diabetes and not ObTape. Watson's doctor did not recall specifically what he told Watson, but he did acknowledge that he wrote "diabetes" in his notes.

The district court, in finding that Watson's claims were time barred, noted that Watson knew the "sling had 'come apart' . . . through her vaginal wall" in January 2005 when she underwent a procedure to remove the remaining ObTape. *See In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, 2016 WL 1574071, at *1 (M.D. Ga. Apr. 19, 2016). The district court reasoned that because

10

Watson knew there was an erosion of the ObTape, she "knew of, strongly suspected, or had enough information to know of a connection between ObTape and at least some of her injuries by the time her doctor excised the ObTape." *Id.* at *3.

## II.    Graciela Urbieta

Plaintiff Graciela Urbieta received her ObTape implant in March 2005.  In January 2006, she was diagnosed with necrotizing fasciitis, a potentially lethal condition, and a thigh abscess.  She can no longer run, work out, or sing, and is forced to wear diapers for her continuing incontinence.  After viewing a television advertisement concerning transvaginal mesh litigation, she filed her suit in July 2013.

Urbieta was treated by several doctors.  She claims that none of her doctors informed her that her injuries were caused by her ObTape.  One doctor did not even know she had been implanted with ObTape, and thus could not have concluded it was the cause.  Another physician diagnosed Urbieta with an eroded sling and removed the sling in December 2006.

The district court concluded that Urbieta should have known of a connection between the ObTape and her symptoms because she knew the sling was infected, and because she had an excision surgery to remove it in December 2006.  *In re*

11

*Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, 2015 WL 9307267, at \*7 (M.D. Ga. Dec. 21, 2015).

## III.    Victoria Kearse

Plaintiff Victoria Kearse received her ObTape implant to treat her stress urinary incontinence in November 2004.  She immediately suffered several side effects including foul-smelling vaginal discharge, severe pain, and several large painful cysts.  Kearse underwent several surgical procedures to excise her ObTape, the third and final surgery taking place in September 2005.  She also underwent three other surgeries to remove her cysts.  Kearse still suffers from abdominal pain.  After hearing about media accounts of transvaginal mesh litigation from her sister, Kearse filed her suit in October 2012.

Kearse believed, and it was confirmed by her doctor, that her own body and not her ObTape was the cause of her injuries.  Her doctor informed her that her condition was caused by "thin vaginal mucosa," rather than the ObTape.  The district court however concluded that because Kearse underwent surgery, she "knew by September 2005 that there was a connection between ObTape and some of her injuries."  *In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, 2015 WL 8578364, at \*4 (M.D. Ga. Dec. 9, 2015).

## IV.    Betty Lou Shaffer

Plaintiff Betty Lou Shaffer received her ObTape implant in November 2003. Shortly thereafter, she began experiencing vaginal pain, which she described as a "sandpaper-like sensation." Shaffer's doctor explained that Shaffer's ObTape had eroded through the incision, and the doctor performed surgery to remove part of the ObTape in February 2004. Shaffer continues to experience vaginal pain and has had to forgo intercourse as a result of her ObTape injuries. After viewing a lawyer advertisement regarding transvaginal mesh complications, Shaffer filed her claim in January 2013.

Until the advertisement, Shaffer claims that she was under the impression that her injuries were a product of her body rejecting a foreign body. However, the district court found that, because Shaffer underwent the removal surgery in January 2004 she "knew of a connection between ObTape and some of her injuries" in 2004. *Id.* at *5. The district court also noted that after the removal surgery, Shaffer's "sandpaper pain feeling went away." *Id.* But Shaffer has asserted that she continues to experience vaginal pain and has had to forgo intercourse.

## V.    Samantha Shirey

Plaintiff Samantha Shirey received her ObTape implant in December 2004. The following year, Shirey experienced multiple symptoms including vaginal odor, pain radiating from her thigh, fever, groin pain, and pain during intercourse. In July 2006, Shirey went through two surgeries to remove her ObTape. After seeing

13

a commercial regarding transvaginal mesh complications, Shirey filed her complaint in October 2012.

Shirey claims that she had no reason to attribute her injury to the mesh. She experienced the same symptoms when suffering from urinary tract infections before the mesh was implanted, so she believed the injury was just a worsening of those infections. Mentor alleges that between Shirey's first and second removal surgeries, her doctor told her that the swelling in her leg was caused by the mesh, and then he removed the ObTape. Shirey refutes this and asserts that her physician attributed her pain to an earlier procedure. However, in Shirey's deposition, she also noted that her physician informed her that removal of the mesh might alleviate her symptoms.

The district court focused on the fact that Shirey's doctor "recommended removing as much of the remaining mesh as possible [and] performed a second excision surgery in July 2006. Therefore, Shirey knew by July 2006 that there was a connection between ObTape and some of her injuries." *Id.* at *4.

## VI.    Michele Rene Jackson

Plaintiff Michele Rene Jackson received her ObTape implant in March 2004. After experiencing severe vaginal pain, severe back and leg pain, and painful intercourse, Jackson underwent surgery to remove the ObTape in November 2004.

14

Jackson filed her complaint shortly after seeing an attorney advertisement about transvaginal mesh in March 2013.

Jackson maintains that neither of her doctors told her that ObTape caused her injuries. One of her doctors testified that while he recommended mesh extraction, he probably attributed the injuries not to a problem with the mesh but to Jackson's overactivity or poor tissue. But Mentor points out that, before Jackson's surgery, one of her doctors told her that the removal would most likely take away her pain. Therefore, she should have known about the connection between ObTape and her injuries.

Relying on the statement from Jackson's doctor telling her that the revision surgery "would most likely take away [Jackson's] pain," the district court concluded that Jackson knew by October 2004 that there was likely a connection between ObTape and her injuries. *In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, 2015 WL 9307267, at *7 (M.D. Ga. Dec. 21, 2015).

## VII. Deborah Rogers

Plaintiff Deborah Rogers received her ObTape implant in September 2005. Thereafter, she suffered a thigh abscess and pain and swelling in her leg. To this date, Rogers suffers from urge incontinence and passes stool intermittently through her vagina. The ObTape was surgically removed in July 2006. After seeing a

15

television advertisement regarding transvaginal mesh litigation, Rogers filed this suit in September 2012.

Rogers alleges that she had no reason to know her ObTape was the cause of her injuries, as none of her doctors informed her it was. Mentor points out that Rogers herself admitted in her deposition that she learned that ObTape was the cause of her injuries while at the hospital in July 2006. Rogers disputes this and in portions of her deposition, as well as in her brief, Rogers alleges that she did not realize Mentor's role in her injuries until she saw the television advertisement.

The district court stated that Rogers knew in July 2006 that she had a foreign body (the ObTape) hanging from her vaginal area and that she had to have it surgically removed; therefore, Rogers knew in July 2006 that ObTape caused her injuries. *In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, 2015 WL 8578364, at *4 (M.D. Ga. Dec. 9, 2015).

## VIII.  Libby Hall

Plaintiff Libby Hall received her ObTape implant in January 2005 to treat her stress urinary incontinence. After Hall suffered symptoms such as urinary tract infections and painful intercourse, the ObTape was removed in July 2005. After seeing a lawyer advertisement regarding transvaginal mesh complications, Hall filed her suit in January 2014.

16

In her deposition, Hall pointed out that her doctor told her that "scarring from the surgery" had "pulled the sling too tight," causing her symptoms.  Mentor alleges that Hall's doctor told her that the exposed mesh was likely the cause of her injuries.  However, in the doctor's deposition he said he could not recall what he told Hall, but he likely would have told her that the ObTape was near the vaginal mucosa and palpable to the touch and this was probably the cause of her pain.

The district court reasoned that "Hall's doctor told her that the ObTape was likely the source of her pain"[2] and thus "Hall knew in July 2005 that there was a likely connection between ObTape and some of her injuries."  *In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, 2015 WL 9307267, at *8 (M.D. Ga. Dec. 21, 2015).

## IX.    Carrie Klum

Plaintiff Carrie Klum received her ObTape implant in June 2004.  Klum suffered from erosion, chronic infections, chronic vaginal pain, and cessation of intercourse due to pain.  Her ObTape was surgically removed in 2006.  After seeing a lawyer advertisement regarding transvaginal mesh litigation, she filed her suit in May 2013.

---

[2] The district court agreed with Mentor and concluded that the doctor's deposition revealed that the doctor told Hall the ObTape was the cause.  However, the doctor's deposition clearly states that he cannot recall what he told her and Hall refutes Mentor's allegation.

17

Klum stated at her deposition that she thought her injuries were the result of a defect in her body and its ability to accept a foreign object like ObTape. According to her doctor's deposition, that is also what he believed at the time. Mentor notes that Klum was informed that her ObTape was infected and told it needed to be removed. Therefore, Mentor alleges she knew of a connection between her injuries and the ObTape in 2006.

The district court focused on the fact that Klum's doctor told her that the entire ObTape needed to be removed and concluded that "by February 2006 at the latest, Klum knew that her injuries were connected to ObTape [but] [s]he did not file her complaint until more than seven years later, on April 29, 2013." *Id.* at *7.

## X.    Andrea Rupert

Plaintiff Andrea Rupert received her ObTape implant in May 2004. She suffered groin pain, vaginal discharge, foul odor, a thigh abscess, and other complications. Her infected ObTape was removed in June 2005. After seeing an advertisement regarding transvaginal mesh litigation, Rupert filed her complaint in March 2013.

Rupert notes that her doctor informed her that her body was not adapting well to the mesh. Rupert also alleges that she engaged in an extraordinary investigation to find the cause of her injury. Before surgery, she read the brochure for ObTape and these risks were not listed. After her ObTape became infected, she

18

even communicated with Mentor. Rupert spoke with an ObTape marketing manager at her excision surgery, who informed her that the product was safe and led her to believe the product was not the cause of her injuries.[3] Mentor does not refute this and just points out that Rupert knew she was having complications with her ObTape when it was removed.

The district court explained that "in August 2005, Rupert visited [a] doctor, who noted that Rupert was concerned that half of her ObTape was still in her body and that it may become infected. Thus, by August 2005, Rupert connected her injuries to ObTape." *Id.* at *7.

## XI. Christina Latta

Plaintiff Christina Latta received her ObTape implant in March 2004. After experiencing discharge and bad odor, Latta underwent four revision surgeries to remove the ObTape, with the final surgery in September 2005. After seeing a television advertisement regarding transvaginal mesh litigation, she filed her complaint in September 2012.

Latta argues that she had no reason to suspect ObTape was the cause of her problem because her own doctor did not know. Her doctor said he did not know what was causing Latta's symptoms but he did not assume it was the ObTape.

---

[3] Rupert noted that "[a] mentor representative documented personal information at my excision procedure . . . . The representative apologized for the injuries that I was experiencing and advised that there were no known defects with this product."

Because of the unusual nature of having so many symptoms, Latta's doctor suspected that Latta's body might have an allergy to polypropylene mesh. He told her that procedures with his other ObTape patients were successful, and therefore she assumed her problems were unique to her body.

Mentor alleges that Latta was informed that a portion of the ObTape had eroded through her vaginal wall. Before and after each of her four revision surgeries, Latta was told in layman's terms that her ObTape had eroded. The district court noted that "[a]t the time, Latta believed that her body was rejecting the ObTape. Therefore, Latta knew in July 2004 that there was a likely connection between ObTape and some of her injuries." *In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, 2016 WL 877773, at \*5 (M.D. Ga. Mar. 2, 2016).

## XII.  Margie Greenman

Plaintiff Margie Greenman received her ObTape implant in January 2004. She experienced vaginal pain and was told that her ObTape had eroded through her vaginal wall. She underwent two surgeries to treat this erosion, one in December 2004 and one in 2010. She continues to experience pain, bleeding, urine leakage, and has had to forgo sexual intercourse because of its painfulness. After reading a pamphlet in a doctor's waiting room in 2011, Greenman made the connection between ObTape and her injuries and filed suit in April 2013.

20

Greenman alleges that her doctor's warnings before surgery included a warning that there is a risk of infection whenever you insert a foreign object into the body.  She therefore did not know that ObTape was causally connected to her injuries until she read the pamphlet.  Mentor alleges that Greenman was told that the ObTape had eroded and therefore she knew of ObTape's connection to her injuries.

The district court reasoned that, "Greenman's doctor diagnosed her with a vaginal erosion and told her that he needed to excise the exposed portion of ObTape . . . .  Therefore, Greenman knew by November 2004 that there was a likely connection between ObTape and some of her injuries."  *Id.*

## II.    STANDARD OF REVIEW

"We review a district court's application of a statute of limitations and its grant of summary judgment de novo."  *F.E.B. Corp. v. United States*, 818 F.3d 681, 685 (11th Cir. 2016).  The evidence should be viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).  Summary judgment may only be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  *Id.* at 247, 106 S. Ct. at 2510 (internal quotation marks omitted).  A genuine issue of material fact exists when

21

"the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Id.* at 248, 106 S. Ct. at 2510. Summary judgment is only appropriate if a case is "so one-sided that one party must prevail as a matter of law." *See id.* at 251–52, 106 S. Ct. at 2512.

## III.    STATUTES OF LIMITATION

Each Plaintiff initially filed her lawsuit in Minnesota state court. Mentor subsequently removed each suit to the United States District Court in Minnesota. The cases were later transferred to the Middle District of Georgia as part of a multidistrict litigation proceeding regarding ObTape. The parties all agree that Minnesota law applies to Plaintiffs' claims.

The issue on appeal is whether the district court properly dismissed Plaintiffs' personal injury claims on summary judgment because they were barred by Minnesota's statutes of limitation. The Minnesota statute of limitation for a strict liability claim is four years. *See* Minn. Stat. § 541.05 subd. 2. The statute of limitation for a negligence claim is six years. *See* Minn. Stat. § 541.05 subd. 1(5). Because we are applying Minnesota law, we must begin by identifying the proper rule for examining statutes of limitation issues in Minnesota. Minnesota law is not clear on this point,[4] but the Eighth Circuit has held that the discovery rule is

---

[4] During this appeal, Mentor argued that the court should reexamine the Minnesota rule of accrual. Mentor advocated that the court should use a "damages" rule and not the Plaintiffs' suggested "discovery" rule. To support this assertion, Mentor argues that the Minnesota

22

applicable. *See Klempka v. G.D. Searle & Co.*, 963 F.2d 168, 170 (8th Cir. 1992).

Because Minnesota state court holdings are nonexistent or ambiguous on this issue,

we should defer to rulings of the Eighth Circuit and the federal district courts of

Minnesota because those courts are frequently called upon to interpret Minnesota

law. *See, e.g.*, *McGregor v. State Mut. Life Ins. Co. of Worcester, Mass.*, 315 U.S.

280, 281, 62 S. Ct. 607, 607(1942) (per curiam) ("In the absence of such guidance

[from Michigan state courts], we shall leave undisturbed the interpretation placed

upon purely local law by a Michigan federal judge of long experience and by three

circuit court judges whose circuit includes Michigan."). Therefore we must apply

the discovery rule in light of Eighth Circuit precedent. Under the discovery rule

---

Supreme Court rejected the discovery rule of accrual fifty years ago in *Dalton v. Dow Chem. Co.*, 158 N.W.2d 580, 584 (Minn. 1968). However, Minnesota district courts have recently addressed the apparent conflict in Minnesota law, specifically addressing *Dalton* and reaffirming the discovery rule. *See Huggins v. Stryker Corp.*, 932 F. Supp. 2d 972, 985–86 (D. Minn. 2013); *Mack v. Stryker Corp.*, 2010 WL 4386898, at *2 (D. Minn. Oct. 28, 2010) (both concluding that "for products liability claims in Minnesota, the discovery rule applies"). Furthermore, Minnesota has not shied away from adopting a causal standard in other cases. *See DeCosse v. Armstrong Cork Co.*, 319 N.W.2d 45, 49 (Minn. 1982) ("[T]he act or omission of exposing Mr. DeCosse to asbestos would continue until the disease manifested itself and was causally linked to respondents' products." (emphasis omitted)).

Mentor also cites to other Minnesota case law that specifically denies the discovery rule, but in a medical malpractice context. *See, e.g.*, *MacRae v. Grp. Health Plan, Inc.*, 753 N.W.2d 711, 719–20 (Minn. 2008). However, *Dalton* acknowledged that malpractice scenarios are fundamentally different. *See Dalton*, 158 N.W.2d at 585. ("Plaintiff has cited several malpractice cases involving claims against a physician or clinic . . . . Cases of the foregoing nature are of a class unto themselves and fail to lend support to [P]laintiff's position.").

Finally, while arguing against the strict liability and negligence claims to the district court, Mentor used the two-prong discovery rule standard from *Hildebrant v. Allied Corp.*, 839 F.2d 396, 398 (8th Cir. 1987). More importantly, that is the standard the district court then adopted. Given that Minnesota district courts have recently reaffirmed the discovery rule and both parties argued it to the district court below, we will continue to apply this two-prong standard.

23

two elements must be satisfied before a cause of action accrues in cases involving injuries caused by a defective product: "(1) a cognizable physical manifestation of the disease or injury, and (2) evidence of a causal connection between the injury or disease and the defendant's product, act, or omission." *See Klempka*, 963 F.2d at 170.

## IV.    DISCUSSION

In applying the two-prong discovery rule, the district court concluded:

> [E]ach Plaintiff connected at least some of her injuries to ObTape more than six years before she filed suit. Accordingly, their strict liability and negligence claims are time-barred under Minnesota law. Plaintiffs contend that it is not enough that they made a connection between ObTape and some of their injuries. Rather, they appear to argue that they must have been on notice that a *defect* in ObTape caused their injuries. Plaintiffs did not point to any Minnesota authority holding that a plaintiff must be on actual notice that her specific injuries were caused by a product *defect*.

*In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, No. 2004408MD2004CDL, 2015 WL 9307267, at *8 (M.D. Ga. Dec. 21, 2015) (emphasis in original). We find these conclusions unpersuasive. While the district court chose to emphasize the word "defect" in its reasoning, we look at the

24

discovery rule and find the word "causal" to be dispositive.  Knowing of *a connection*[5] is simply not the same as knowing of a *causal* connection.

Summary judgment is only appropriate when there is no genuine issue as to any material fact.  *See Anderson*, 477 U.S. at 247, 106 S. Ct. at 2510.  Whether a plaintiff knows of a *causal* connection between her injuries and the defendant's alleged misconduct is an issue of fact.  Because a reasonable jury could find that Plaintiffs here did not know of a causal connection, we find summary judgment inappropriate.  *See id.* at 248, 106 S. Ct. at 2510.  The district court reasoned "that the cause of action did not accrue until the [P]laintiffs had some objective information suggesting a causal link between the product and the injury."  *In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, 2016 WL 1574071, at *3 (M.D. Ga. Apr. 19, 2016).  We agree with that standard as articulated, but we conclude that the evidence is not so one-sided as to whether Plaintiffs had information suggesting causation to make summary judgment appropriate.  *See Anderson*, 477 U.S. at 251–52, 106 S. Ct. at 2512.

Viewing the evidence in the light most favorable to Plaintiffs, none of Plaintiffs' doctors attributed Plaintiffs' symptoms to a problem with the ObTape.  While all the doctors recommended removing the ObTape, and in fact did remove

---

[5] The district court avoided the word "causal" in its application of the discovery rule to Plaintiffs' claims.  In its analysis of each Plaintiff, the court repeatedly used the phrase, "a connection" or "a likely connection."  *See, e.g.*, *In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, 2016 WL 877773, at *5 (M.D. Ga. Mar. 2, 2016).

25

some or all of it, none of the doctors could remember telling their patients that the ObTape was causing the symptoms. Mentor and the district court cite to portions of the doctors' depositions in which the doctors recall suggesting removing the ObTape, or hint that removal might alleviate the patients' symptoms, but Mentor cannot point to any evidence that the doctors indicated that ObTape was not merely involved but was the actual *cause* of the symptoms. Indeed, nothing in the record suggests that the doctors knew or should have known of a causal connection. A sister circuit court reasoned that "lay persons should not be charged with greater knowledge of their physical condition than that possessed by the physicians on whose advice they must rely." *See Moyer v. United Dominion Indus., Inc.*, 473 F.3d 532, 550 (3d Cir. 2007) (applying the Pennsylvania discovery rule). We agree. It is unfair to expect patients to realize there is a causal connection when their own doctors do not.

Furthermore, it is not "clear that the limitations' determination can be made as a matter of law. [Keeping in mind] that we must view all evidence in the light most favorable to the nonmovant and draw all reasonable inferences in her favor, we conclude the limitations issue is for the jury to determine." *See Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 922 (8th Cir. 2004).

The district court's analysis places great weight on the fact that the ObTape was removed from each Plaintiff. However, this fact alone, while it may raise

26

suspicion that ObTape was involved, is not enough evidence to expect Plaintiffs to identify a causal connection. In *Hildebrandt*, the Eighth Circuit held that, under Minnesota law, "[t]here is a substantial difference between knowledge of injury and the cause of that injury and mere suspicion." *See Hildebrandt*, 839 F.2d at 399. Plaintiffs are entitled to wait until the cause has been "rationally identified." *See id.* While the removal may have caused suspicion, it is not enough evidence of a causal connection to warrant summary judgment.

Furthermore, this case is similar to *Ballew*, and there, analyzing a case under Georgia's statute of limitation rules (that mirror Minnesota's rules and require a "causal connection") we reversed a grant of summary judgment. *See Ballew v. A. H. Robins Co.*, 688 F.2d 1325, 1327 (11th Cir. 1982). In that case, the plaintiff had pelvic pain after a Dalkon Shield intrauterine device (IUD) was implanted. She asked her doctor whether the IUD was responsible and the doctor said he did not know. We found that the statute of limitations period did not begin to run until the plaintiff learned of lawsuits involving the Dalkon Shield IUD. *Id.* at 1328. We concluded that the facts could support a finding that the plaintiff knew of a causal connection between the IUD and her pain, but the facts were equally susceptible of showing that plaintiff did not know of a causal connection, and therefore the case was inappropriate for summary judgment. *Id.* Likewise here, while the facts could support a finding that Plaintiffs knew their symptoms had something to do with the

27

ObTape, they are equally susceptible of showing that Plaintiffs did not know their symptoms were caused by the ObTape. For example, in the case of Watson, the facts could support a finding that she was aware her injuries could be causally connected to her ObTape when her doctor removed it, but the facts are equally susceptible of showing that she could not have known of the causal connection because of her doctor's warnings regarding her diabetes.

Finally, if we were to disregard the word "causal" in the discovery rule, it would mean that anytime one uses a product and has injuries near in time, you should sue or lose your claim. This would lead to pointless litigation and scores of unripe claims. Indeed, the Eighth Circuit stated in *Hildebrandt* that, "we do not believe Minnesota's applicable statutes of limitation were intended to provoke the premature commencement of claims for [] sickness." *See Hildebrandt*, 839 F.2d at 399.

## V. CONCLUSION

In conclusion, we hold that the Eighth Circuit's discovery rule is the appropriate standard for determining the accrual date for the statutes of limitation in products liability cases under Minnesota law. Applying this standard to Plaintiffs' claims, the district court erred in dismissing the claims as time barred.

**REVERSED AND REMANDED.**